JENNIE WINN, ELIZABETH ANNA JEFFRIES and LEROY F. JEFFRIES, Appellants, v. MARY E. GRIER, PASCAL KARNES, ABIGAIL GILPIN, CARRIE GILPIN, EDWARD GILPIN, JOHN KARNES and MAGGIE TULL.

Division Two, March 9, 1909.

1. **WILL CONTEST: Peremptory Instruction for Proponents: Incapacity.** A suit to contest a will is an action at law, and if there is substantial evidence of testator's incapacity the issue is for the jury. But if there is no such evidence, the court should give a mandatory instruction directing a verdict for proponents on that issue.

2. ———: ———: ———: **Eccentricities.** The manifestation of numerous eccentricities by the aged testator prior to the execution of his will does not of itself show incapacity. So that where testator used excessive amounts of a patent kidney medicine and recommended it to his friends for all kinds of diseases; manifested a hitherto unknown desire to make political speeches, and was positive in his utterances that certain candidates should not be permitted to run for office, and that Bryan was not honest and McKinley was not fit to be President, and that he could make a better President than McKinley; got up at night and sang Psalms; took his dogs and went hunting at night, though he got no game, and had not in former years been known to hunt; exhibited his stallion and other stock at church meetings, failed to recognize acquaintances, carried on disconnected conversations, had a roaring in his head, used coal oil in his ears, and poured coal oil on trees and when it killed them said he had no sense,—neither these eccentricities nor other peculiarities like them show a want of capacity to make a will, and opinions predicated upon them that he was incapacitated give no additional force to those facts, nor do they tend to establish incapacity.

3. ———: ———: ———: **Expert Testimony.** Testimony of a mind expert who testifies, in answer to a hypothetical question, that, "without seeing the man, I would say he is mentally inefficient," is not sufficient to authorize a submission to the jury of the question of testator's incapacity to make a will. Testator might have been incapacitated to transact a complicated matter or mentally inefficient in some respects, yet possessed of sufficient capacity to make a valid and perfectly intelligent will.

4. ———: ———: ———: **Devising Land Previously Given.** Small significance, as showing the testator did not know what property he owned, is to be attached to the fact that he devised to a daughter a certain house and lot which had many years previously been deeded to her by the vendor, when it is shown that the testator furnished the money that bought the property.

5. ———: **Undue Influence.** The influence exercised upon a testator sufficient to invalidate his will must be of such a nature and character as amounts to overpersuasion, coercion or force, destroying his free-agency or will-power, as contradistinguished from the mere influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected and trusted by him.

6. ———: ———: **Unequal Distribution.** Unequal distribution, in the form of advancements made by the testator to his children within his lifetime, is not sufficient to establish undue influence. Nor is the fact that he gave nearly all his remaining property to a son who had remained with him after he became of age and assisted him in after years in managing his business, and to a daughter who gave to him unusual care and attention in his old age, any evidence of undue influence. Inequality, to authorize the submission of the question of undue influence to the jury, should be shown by substantial evidence to be the result of coercion or importunity that could not be resisted.

7. ———: **Newly-Discovered Evidence.** Where the motion for a new trial on the ground of newly-discovered evidence did not embrace the newly-discovered evidence or the names and addresses of the witnesses who would testify thereto, or was not sworn to, the newly-discovered evidence will not be considered on appeal.

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman,* Judge.

AFFIRMED.

*C: F. Strop, J. W. Boyd* and *Eugene Silverman* for appellants.

(1) Mental incapacity to invalidate a will may be shown by taking into consideration the testator's physical condition, his age, the nature of his will and disposition of his property, and the surrounding facts and circumstances. It is not necessary that insanity actually exist. It is sufficient if, upon the whole case made, the evidence tends to show lack of testamentary capacity. Chappell v. Trent, 19 S. E. (Va.) 304. The above case is a leading case, which discusses thoroughly the general rule of testamentary capacity. See, also, in re Shaw's Will, 2 Redfield Sur. Rep. 107; Appeal of Richmond, 22 Atl. (Conn.) 82; McDaniel v. Crosby, 19 Ark. 533; Harvey v. Anderson, 12 Ga. 76; Prentis v. Bates, 53 N. W. (Mich.) 153; Will of Mary Ames, 2 N. W. 408; Roberts v. Bartlett, 190 Mo. 680. (2) The statute in relation to will contests is *in pari materia* with the statutes governing ordinary trials, and if there is any testimony either upon the question of mental incapacity or upon the question of undue influence, the case should be submitted to the jury. State ex rel. v. Guinotte, 156 Mo. 520; Young v. Ridenbaugh, 67 Mo. 574; Appleby v. Brock. 76 Mo. 314; Goodfellow v. Shannon, 197 Mo. 278; Knapp v. Trust Co., 199 Mo. 666. (3) The burden is upon proponents, respondents herein, to establish the sanity of the testator; nor is the burden shifted by the introduction of the testimony of the attesting witnesses. The attesting witnesses make a prima-facie case, but when there is any evidence of insanity or lack of capacity or undue influence, the burden of proof remains with the proponents, and is not shifted throughout the case. Jones v. Robert, 37 Mo. App. 172; Elliott v. Wellby, 13 Mo. App. 28; Benoist v. Murrin, 58 Mo. 322; Norton v. Paxton, 110 Mo. 456; Karl v. Gamble, 120 Mo. 297; Goodfellow v. Shannon, 197 Mo. 279; Roberts v. Bart-

lett, 190 Mo. 680.  (4)  The fact that testator had been during his entire life on terms of intimacy and friendship with his two daughters, who were disinherited, that the will was not in accordance with the testator's past life and violated the Statute of Descents and Distributions and was unjust as to these two daughters, raises a strong suspicion of undue influence, which is sufficient to cast upon the proponents the burden of showing that the will was the voluntary act of testator and was not procured by undue influence.  In re Budlong's Will, 27 N. W. 925; Simms v. Russell, 57 N. W. 601; Gay v. Gilliland, 92 Mo. 250.  (5)  The fact that John Karnes had, during the lifetime of deceased, received three hundred and twenty acres of the most valuable land belonging to the deceased, and the further fact that he had received during the lifetime and late in the lifetime of deceased, a large amount of personal property with none of which he was charged in the will, the fact that John Karnes was the confidential adviser and general business agent of deceased during the latter years of his life, raises a presumption of undue influence, and the law exacts strict proof as to the mental capacity of testator, and also a direct showing that no undue influence was used.  Jones v. Roberts, 37 Mo. App. 163; Woods v. Devers, 1 S. W. 1; Lane v. Moore, 23 N. W. 828; Garven, Adm., v. Williams, 44 Mo. 465; Tibbe v. Kemp, 154 Mo. 580; Bradshaw v. Yates, 67 Mo. 221.  (6)  Even though the evidence might not be conclusive or even entirely satisfactory upon the question of the lack of capacity, and even though the evidence might not be conclusive or entirely satisfactory upon the question of undue influence or constructive fraud, yet it is certain that if there was any lack of testamentary capacity, the opportunity for undue influence would increase in proportion to the degree of lack of capacity, and therefore, where there is evidence, even though slight, upon both of these propositions, the proponents then

have cast upon themselves the burden of making a clear showing, both as to the capacity of testator and the absence of undue influence. McDaniel v. Crosby, 19 Ark. 533; Will of Mary Ames, 2 N. W. 401; Meyer v. Hauber, 98 Mo. 438; Caldwell v. Anderson, 104 Pa. St. 109; Reun v. Samos, 33 Tex. 760; Smith v. Smith, 19 N. W. 47; Appeal of Cuthbertson, 97 Pa. 163. (7) Undue influence may be exercised secretly as well as openly, especially where confidential relationship exists between the principal beneficiaries and testator, and in such case it is not easy to make out an allegation of undue influence by proof which is direct or positive, nor is it necessary so to do. Herster v. Herster, 11 Atl. 410; Bradford v. Blossom, 190 Mo. 110. (8) Where there is no just reason for discrimination and there is evidence of undue influence, though slight, the burden will be on proponents. The will under such circumstances is avoided for legal fraud and not actual fraud. McFaddin v. Catron, 120 Mo. 253; Gay v. Gilliland, 92 Mo. 250. (9) Where the evidence tends to show that the testator was suffering from mental weakness as the result of old age or from insanity, which was not produced by a sudden cause, but as a result of a chronic state of the brain, if this condition of the mind is shown to have existed before and after the execution of the will, it is unnecessary to show the condition at the exact time the will was made, for the reason that the law will presume, in the absence of clear evidence to the contrary, that the same mental condition continued, and the same cause which produced lack of mental capacity still operates. Giles v. Hodge, 43 N. W. 163; Daily v. Casteel, 56 Wis. 444; Smith v. Smith, 60 Wis. 326; Von DeVeld v. Judy, 143 Mo. 365; In re Bull's Will, 19 N. W. 503; Bever v. Spangler, 61 N. W. 1072.

*Neville & Grier* and *Mytton, Parkinson & Crow* for respondents.

(1) Appellants did not state in their motion for new trial the alleged newly-discovered evidence or the names and addresses of the witnesses who would testify to the alleged newly-discovered evidence, and the motion for a new trial was not sworn to, and for these reasons it was the duty of the trial court to refuse to consider any alleged newly-discovered evidence, and same is not before this court because it was not presented to the trial court in the manner provided by law. King v. Gilson, 104 S. W. 52; State v. Norman, 159 Mo. 535; State v. Welsor, 117 Mo. 582; State v. Ray, 53 Mo. 349; State v. McLaughlin, 27 Mo. 111; State v. Rockett, 87 Mo. 666; State v. Butler, 67 Mo. 63. (2) The test of a testator's competency to make a will is, that the testator understood the business about which he was engaged when he had his will prepared and executed, knew the persons who were the natural objects of his bounty, and understood his relations to them, and knew what property he had and the disposition he desired to make of it. Von De-Veld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; Sehr v. Lindeman, 153 Mo. 276; Jackson v. Hardin, 83 Mo. 175; Riley v. Sherwood, 144 Mo. 355; Riggin v. Westminster College, 160 Mo. 570; Couch v. Gentry, 113 Mo. 248; Wood v. Carpenter, 166 Mo. 465; Kirschman v. Scott, 166 Mo. 214; Crowson v. Crowson, 172 Mo. 691; Maddox v. Maddox, 114 Mo. 47; Hamon v. Hamon, 180 Mo. 685; Sayre v. Trustees, 192 Mo. 95; Archambault v. Blanchard, 198 Mo. 384; McFadin v. Catron, 120 Mo. 253. It requires evidence of some probative force that at the time of the execution of the will testator was not of sound mind and disposing memory. Von DeVeld v. Judy, 143 Mo. 363. A man may be capable of making a will and yet be incapable of making a contract or managing his estate. Maddox

v. Maddox, 114 Mo. 35; Crowson v. Crowson, 172 Mo. 702. Opinions of non-experts not based upon sufficient facts do not tend to show incapacity. Crowson v. Crowson, 172 Mo. 691; Sehr v. Lindeman, 153 Mo. 277. Expert testimony as to the soundness of mind of testator not based on sufficient facts is wholly worthless. Riley v. Sherwood, 144 Mo. 354; Sayre v. Trustees, 192 Mo. 128. Where the evidence is such that it would be the plain duty of the court to set aside a verdict as unsupported by the evidence, it is his duty to interfere before submission. Jackson v. Hardin, 83 Mo. 175. The burden was on appellants to show incompetency and undue influence. Sehr v. Lindeman, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 571. The presumption of competency indulged by the court, together with evidence of the due execution of the will, must be overcome by persuasive evidence. Riggin v. Westminster College, 160 Mo. 578. (3) The influence exerted upon a testator which would be sufficient to invalidate his will must be such as amounts to over-persuasion, coercion or force, destroying the free agency or will-power, and not merely the influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected and trusted by the testator. Jackson v. Hardin, 83 Mo. 175; Cash v. Lust, 142 Mo. 630; Sehr v. Lindeman, 153 Mo. 277; Maddox v. Maddox, 114 Mo. 35; Hamon v. Hamon, 180 Mo. 685; McFadin v. Catron, 138 Mo. 197, 120 Mo. 253; Scheierbaum v. Schemme, 157 Mo. 1; Doherty v. Gilmore, 136 Mo. 419; Campbell v. Carlisle, 162 Mo. 633; DeFoe v. DeFoe, 144 Mo. 545; Riggin v. Westminster College, 160 Mo. 570; Kirschman v. Scott, 166 Mo. 214; Wood v. Carpenter, 166 Mo. 465; Tibbe v. Kemp, 154 Mo. 545; Martin v. Bowdern, 158 Mo. 379; Thompson v. Ish, 99 Mo. 160. It is charged that the will of Mr. Karnes was procured by the undue influence of his son John N., and the only evidence on that subject

is that John N. attended to part of the testator's business; that Mrs. Tull, daughter of testator, was given $2,500 more than any other child, and the balance of the estate was divided equally between all the children except Mrs. Winn and Mrs. Jeffries. It is in evidence that there was serious trouble between Mrs. Winn and her family and Mrs. Jeffries and her family on one side, and testator on the other, a short time before the execution of the will, and there was no advantage given John N. by the terms of the will except to deprive Mrs. Winn and Mrs. Jeffries of the part of the estate that would have descended to them under our statute. Even if John N. had the power to unduly influence testator, the evidence conclusively shows that such power was not exercised by him. Cash v. Lust, 142 Mo. 630; Sehr v. Lindeman, 153 Mo. 276; Crowson v. Crowson, 172 Mo. 703; Thompson v. Ish, 99 Mo. 160; Campbell v. Carlisle, 162 Mo. 635; Jackson v. Hardin, 83 Mo. 175; Norton v. Paxton, 110 Mo. 456; Maddox v. Maddox, 114 Mo. 35; McFadin v. Catron, 138 Mo. 197, 120 Mo. 253. Undue influence must not only exist to set aside a will, but it must be shown by affirmative proof to have been actually exerted at the time the will was executed. Tibbe v. Kemp, 154 Mo. 545; McFadin v. Catron, 120 Mo. 275. Partiality and unequality of gifts by testator to one child or children are not sufficient grounds for setting aside a will, even though testator gives nearly all of a very large estate to one child. McFadin v. Catron, 138 Mo. 197. The fact that John Karnes attended to practically all of testator's business, was intimately associated with him, and that the same condition existed as to Maggie Tull, and, in addition, she nursed him in sickness, will not shift the burden to defendants. Campbell v. Carlisle, 162 Mo. 635. There is no substantial evidence in the record tending in the slightest degree to prove that George Sampson Karnes, on the 8th day of January, 1901,

was not of sound mind or disposing memory, or that any influence of any kind or character was exercised upon the mind of Mr. Karnes in the execution of the will.

FOX, J.—From a judgment and decree of the circuit court of Buchanan county, in favor of defendants, plaintiffs appeal.

This is a proceeding to contest the validity of the will of George S. Karnes, who died in Buchanan county, Missouri, on the — day of March, 1904, at the age of eighty-two. Mrs. Jennie Winn and Mrs. Elizabeth Jeffries are daughters of George S. Karnes, deceased, and Leroy Jeffries, the husband of Mrs. Jeffries. The defendants, or proponents of the will, are children of the deceased; Edward Gilpin, husband of Carrie Gilpin, and John N. Karnes, being executors of the will. On January 8, 1901, deceased made, executed and published what purported to be his last will and testament and said will was duly admitted to probate by the probate court of Buchanan county, Missouri, on March 18, 1904, and the defendants, Edward Gilpin and John N. Karnes, appointed therein as executors, duly qualified as such and took charge of the estate.

The petition alleges that for many years prior to the time of his death and prior to the time of the execution of the alleged last will and testament of said George S. Karnes, said George S. Karnes was decrepit and infirm both in mind and body; that prior to the date of the execution of the alleged will and for some years before said date, said George S. Karnes had languished both in mind and body, and had been entirely unable to manage his own affairs and transact his own business, and that at the time of the execution of the alleged last will and testament deceased did not have sufficient mental capacity to make a will, and did not have sufficient mental ca-

pacity to know or understand the nature of said in-
strument or the effect thereof, and that said alleged
last will was not the free and voluntary act of said
George S. Karnes; that at the time of the execution
of the will, Margaret Tull, one of the children of said
George S. Karnes, and the principal beneficiary under
the terms of said will, was residing with and was
caring for said George S. Karnes, was nursing and
ministering unto him during his sickness at said time,
and exercised complete control and dominion over the
mind of said George S. Karnes; that John N. Karnes,
one of the defendants herein, for many years prior
to the death of said George S. Karnes, managed the
affairs of said George S. Karnes and transacted al-
most all of his business, and that in the management
and transaction of his business said George S. Karnes
relied for guidance and assistance entirely upon the
said John N. Karnes; that said John N. Karnes re-
sided within a short distance of George S. Karnes
and almost daily and frequently often during the same
day was at the place of said George S. Karnes, ex-
ercising complete dominion, control and authority,
not only over the affairs of said George S. Karnes,
but also over said George S. Karnes himself.    The
petition further alleges that the defendants conspired
together for the purpose of prejudicing the mind of
said George S. Karnes against the plaintiffs, and for
the purpose of procuring the disinheriting of the plain-
tiffs by said George S. Karnes; that said defendants
conspiring together and using their influence upon said
George S. Karnes, caused him to acquire a dislike for
plaintiffs, which said dislike was without cause or
excuse, and was the result of the conduct of defend-
ants and by their influence over said George S. Karnes;
that until George S. Karnes became old, decrepit and
infirm and until his mind became impaired, he had
great affection for plaintiffs, and that the aforesaid
dislike of said George S. Karnes for the plaintiffs

was the result of long and persistent deceit and fraud
on the part of defendants, especially of Maggie Tull
and John Karnes; that said Maggie Tull and John
Karnes, well knowing that George S. Karnes had be-
come infirm both in mind and body and well knowing
that he was unable to withstand their influence, both
jointly and singly set about to procure the execution
of the alleged last will and testament, and to that
end continually misrepresented the conduct and ac-
tions of the plaintiffs toward their father, and falsely
represented to said George S. Karnes and made him
believe that these plaintiffs were devoid of affection
toward him, and said Maggie Tull and John Karnes
so completely dominated the failing mind of said
George S. Karnes as to make him falsely believe that
the plaintiffs were in collusion against him for the
purpose both of securing his property and destroy-
ing his happiness during his declining years, and made
him falsely believe that he had already given to the
plaintiffs more than their just share of his estate,
which was well known to said Maggie Tull and John
Karnes to be false. The petition further alleges that
defendants Maggie Tull and John Karnes, particularly
during the last few years of the life of said George S.
Karnes, and especially at the time of the execution
of the alleged will by said George S. Karnes, were
his confidential advisers, and in the execution of the
alleged will Maggie Tull and John Karnes substituted
their will and wish for the wish of George S. Karnes,
and that the alleged will was the direct result of
undue influence, fraud and deceit practiced upon said
George S. Karnes by each of the defendants, especially
by Maggie Tull and John Karnes.

The answer of the defendants admits the death of
George S. Karnes, and that at the time of his death
he was a resident of Buchanan county, Missouri; ad-
mits that plaintiffs are daughters of the said George
S. Karnes, deceased, and that the defendants are also

children of George S. Karnes, deceased; admits that George S. Karnes did not leave surviving him a widow and that he left no children except the parties to this suit, and that there are and were no children of deceased children, and after admitting the execution of the will and affirming its validity, denies all other allegations of the petition.

The cause was tried at the regular January term, 1905, of the circuit court of Buchanan county. The testimony introduced upon the trial tended to show that George S. Karnes, commonly called Sampson Karnes, resided in Buchanan county, Missouri, for more than sixty years prior to the execution of the will introduced in evidence, and during the greater part of that time was a man of large means, carried on an extensive business in farming and stock raising, transacted business with the banks of the city of St. Joseph, and at the time of his death had on time deposit with the Tootle-Lemon National Bank, $4,500. He left a will dated January 8, 1901. The will was drawn by Mr. Henry M. Ramey, who was at that time practicing law in the city of St. Joseph, and was attested by John S. Lemon, president of the Tootle-Lemon National Bank, J. C. Wyatt, merchant, and John F. Imel, attorney at law. At the trial of the cause Mr. John S. Lemon was unable to be present in court on account of the condition of his health.

On the part of the proponents of the will the evidence was substantially as follows:

J. C. Wyatt, one of the subscribing witnesses, testified that he was engaged in the mercantile business in the city of St. Joseph, and that he had known Mr. Karnes for about thirty-five years. In substance this witness testified as follows: When I first knew Mr. Karnes he was very strong mentally and physically; in my opinion he was a man of rather more than average intelligence; a man with a good mind, strong memory, I think; that condition existed as far

as I know up to three or four years ago; I saw him frequently; customer of ours, and I talked a great deal with him personally in a business way; I think I saw him on an average of once a week up to the last four or five years previous to his death. Mr. Karnes was a very positive man—a man of positive opinions, and a man that understood his business thoroughly. About four years ago Mr. Karnes asked me to witness his will. I was sent for at the store; I found him in Judge Ramey's office; I don't remember all the little details that occurred there; however, he asked me to witness his will; asked some other gentlemen—two others also. The will was read; it struck me as being an unusual occurrence; I had witnessed a number of wills and I never knew of one previous to that being read; after the will was read and before he signed it, he said it was just as he had requested it to be made. Mr. Karnes signed the will in the presence of Mr. Imel, Mr. Lemon, Judge Ramey and myself. At the time of the execution of his will he was changed a little in his physical condition, probably on account of his age, but with reference to his mental condition I saw nothing that caused me to question it. In the transaction of his business his family bought the goods—Mr. Karnes sometimes would buy them, and often would not—whatever his family might purchase, probably within a month or less or more, he would come in and pay the bill; I have no recollection of any one else having paid the bills up to three or four years ago. As a rule when people come into the store to pay their bills they pay them to the cashier, but Mr. Karnes either wanted Mr. Townsend or myself to attend to that for him; he seemed to be that peculiar about it.

John F. Imel, another one of the subscribing witnesses, testified that he was engaged in the practice of law, and at the request of Judge Ramey he called at his office to witness the execution of this will. This

witness testified that he was not acquainted with
George S. Karnes prior to the meeting on January 8,
1901. He further stated: Some statement was made
in the presence of Mr. Karnes that he was close to
eighty years of age. Judging from his actions, his
talk and his conduct, and just from looking at him
and talking to him I would judge him to have been
about sixty years of age. Judge Ramey read the will
over to him and we moved around a little in signing
it; Mr. Karnes got up as I remember it and went up
to the desk and signed it; he said that was his will,
and he asked us parties that were there to act as
witnesses for him, and declared it to be his will, and
then we signed it as witnesses. After the will was read
over, just before I signed it, I says, "Mr. Karnes, do
you think of any change that you want in that since
hearing it read over?" and he said, "None at all. That
is exactly right; that is the way I want it." He seemed
to understand fully the subject he was discussing. He
was apparently a well man. In answer to a question
as to whether or not in his opinion George S. Karnes
was at that time mentally capable of making, execut-
ing and publishing this paper as his last will and
testament, the witness answered: "I think he was
capable of doing it; as much so as any other man."
Witness identified his signature as a witness to the
paper, also the signature of George S. Karnes and
testified that the will was signed in his presence.

Over the objection of the plaintiffs, proponents
then offered the will itself in evidence, which is in
words and figures as follows:

"Know All Men By These Presents, That I,
George S. Karnes, of the county of Buchanan, in the
State of Missouri, being of sound mind and disposing
memory, do make and publish this my last will and
testament, hereby revoking all former wills by me
made:

217 Sup—28

"First.  Upon my death and the probate of this my last will I desire and direct my executors to take out letters of administration and take charge of all my estate, both real, personal and mixed, except the real estate hereinafter given to my daughter, Sarah J. Winn, which they are not to take into their possession except to turn over to her, unless the same is necessary to pay my debts or the legacies hereinafter bequeathed.

"Second.  I have now eight children living.  First: Mary E. Grier, wife of William Grier; Elizabeth Anna Jeffries, wife of Leroy Jeffries; Sarah J. Winn, intermarried with Furman S. Winn; Pascal W. Karnes, Abigail Gilpin, wife of William Gilpin; John N. Karnes, Carrie Gilpin, wife of Edward Gilpin, and Margaret E. Tull, wife of Charles Tull.  My beloved wife is dead and the above named are all of my living children and heirs at law.

"I have from time to time given to each of my said children, property and money in such amounts as to me seemed proper and just.

"The land I have given to my daughters was deeded to their husbands.

"To my daughter Mary Grier I have given land and personal property.

"To my daughter, Elizabeth Anna Jeffries, I gave land and personal property.

"To my daughter, Sarah J. Winn, I gave money and other personal property, and paid out large sums for her and her husband which I estimate at six thousand five hundred (6,500) dollars.

"To my son, Pascal W. Karnes, I gave some land and money and other personal property.

"To my daughter, Abigail Gilpin, I gave land and personal property.

"To my son, John N. Karnes, I gave land.

"To my daughter, Carrie Gilpin, I gave money

and other personal property, and to my daughter, Margaret E. Tull, I gave money and other personal property.

"The money, personal property and land that I have heretofore given to my children were not in equal amounts. To some I have given more than to others.

"I gave more to my son, John N. Karnes, than I have given to any other child, but he worked for me many years after he became twenty-one years of age, without pay, and I desired in some measure to compensate him for his services.

"The gifts above referred to were made by me to my children from time to time, after fully considering all the facts and surrounding circumstances, and it is my desire and will that none of the land, money or personal property be brought into hotch-pot or accounted for by any one of my said children, but that each and every one of them retain as his or her respective property, all that I have heretofore given to them and each of them.

"Third. I give and bequeath to each of my daughters, Elizabeth Anna Jeffries and Sarah J. Winn, five dollars, to be paid to each of them by my executors within the time and in the manner hereinafter provided.

"Fourth. I give and bequeath to my daughter Margaret E. Tull, her heirs and assigns forever two thousand five hundred dollars to be paid to her by my executors, in the manner and within the time hereinafter specified.

"Fifth. I give and devise to my daughter, Sarah J. Winn, the north sixty feet of lots one, two, three, four, and five, in block two in Rogers' Second Addition, an addition to the city of St. Joseph, Buchanan county, Missouri, together with all the hereditaments and appurtenances thereto belonging, or in any wise appertaining to have and to hold unto her, her heirs and assigns forever.

"Sixth. After the payment of the legacies given to my daughters by paragraph three and four of this will, I give, devise and bequeath all the rest, residue and remainder of my property, real, personal and mixed, of every nature and kind, and wherever situate, to my sons and daughters, Mary E. Grier, Pascal W. Karnes, Abigail Gilpin, John N. Karnes, Carrie Gilpin and Margaret Tull, share and share alike, to have and to hold unto them, their heirs and assigns forever.

"Seventh. Should either of my sons or daughters named in paragraph six of this will, die without issue of his or her body or direct descendents in blood, then the share of said deceased shall go to the brothers and sisters named in said paragraph six, share and share alike.

"Eighth. Should my daughters, Elizabeth Anna Jeffries and Sarah J. Winn, or either of them decease before I do, then I direct that the legacies directed by paragraph three of this will to be paid them respectively shall not be paid to the heirs of said deceased daughter, but shall go to my children named in paragraph six of this my will, share and share alike.

"Ninth. Having the most implicit confidence in the honesty and fidelity of my son-in-law, Edward Gilpin, and my son, John N. Karnes, I hereby name and appoint them executors of this my last will and testament.

"Tenth. My executors are hereby directed to take charge of all my estate and to first pay all my debts and next to pay the legacies provided for in this will, the legacies to be paid to the respective parties within the shortest time possible, under the administration laws of the State.

"Eleventh. If in the opinion of my said executors it becomes necessary to sell any of my real estate

to pay my debts or to pay the legacies herein provided for, then in that event they are hereby directed and empowered to sell said real estate or so much thereof as in their judgment is necessary for said purposes, provided that the real estate given to my daughter, Sarah J. Winn, shall not be sold to pay debts or legacies until after all my other real estate has been sold and the proceeds applied to the payment of said debts and legacies.

"Twelfth. Upon taking charge of my estate my said executors shall immediately turn over to my said daughter, Sarah J. Winn, the real estate devised to her by paragraph five of this will unless in their judgment such real estate is necessary to pay my said debts or the legacies herein provided for.

"Thirteenth. On the first day of April, 1897, I conveyed by deed duly executed to John N. and Pascal W. Karnes, about one-fourth of an acre of ground in the northwest corner of the southwest quarter of section five in township fifty-six of range thirty-four, being the family cemetery, in trust, as in said deed provided, and I hereby direct and empower my said executors to turn over to said trustees from time to time sufficient money to enable them to keep said cemetery in order and proper repair.

"Fourteenth. After fully administering my estate the payment of all just debts and the legacies herein provided for, all the rest and residue of my property, real, personal and mixed, shall be turned over to my sons and daughters named in paragraph six of this will.

"In witness whereof, I have hereunto set my hand this 8th day of January, 1901.

"GEORGE S. KARNES.

"We, the undersigned, attest the above and foregoing will by subscribing our names hereto as wit-

nesses in the presence and at the request of George S. Karnes, the testator, this 8th day of January, 1901.

"JOHN C. WYATT,
"JOHN S. LEMON,
"JOHN I. IMEL."

On behalf of the plaintiffs eighteen or nineteen witnesses were introduced, and the record is quite voluminous. We do not deem it essential to a correct determination of the legal propositions involved to burden this opinion with a reproduction in detail of their testimony. It is sufficient to say that we have carefully read in detail the entire disclosures of this record. The witnesses testifying on behalf of the plaintiff were the plaintiffs, their two children, a nephew of testator and neighbors and acquaintances of George S. Karnes.

Witness Evans testified that Mr. Karnes failed to recognize him on two occasions, and that when he, witness, told him his name was "Evans" testator inquired, "What Evans?" to which witness replied, "Louis;" that testator then remarked that he was growing old pretty fast; he didn't know everybody. That was in 1900; that later on meeting him in the cemetery he had to again tell him who he was; on other occasions Mr. Karnes always recognized him. This witness further testified that he noticed a change in Mr. Karnes four years ago last November; that he was physically running down. On the two occasions referred to, witness testified that testator looked wild out of his eyes—excited.

Other witnesses testified that at times testator failed to recognize acquaintances, and when told who they were would express surprise, and say, "Oh, yes, that is so," or that he was absent-minded, or words to that effect. Witnesses testified that at times Mr. Karnes talked incoherently and disconnectedly, and that in the discussion of politics he would become very

much excited, and say that certain men ought not to be·
allowed to run for office.

The testator was a strong Republican; he con-
demned William J. Bryan; said he wasn't honest, and
that he ought not to be allowed to run; that he was
as able a man as McKinley; that McKinley was not a
good Republican, and expressed the opinion that he
(testator) could have been President had he devoted
his time and energy in that direction, and that he
would have made a better President than McKinley.

The testimony further tends to show that Mr.
Karnes would get up at all hours of the night, take
the house dogs with him and go off into the woods
by himself, and would come back and say that he had
been hunting, but that he was never known to bring
in game; that in his earlier life he had never been
disposed to be a hunter; that he would sing hymns
and psalms and make political speeches in the night,
either in his room or in the yard. One of the witnesses
testified that on one occasion in discussing the subject
of wills, Mr. Karnes stated that he was opposed to
wills; and that the law could make a better will than
he could.

The evidence further tended to show that for
many years he had been affected with kidney trouble
and that he had taken large quantities of Warner's
Safe Cure; that he recommended Warner's Safe Cure
to his sick neighbors, irrespective of their ailments.
The evidence further tended to show that he had a
large wen upon his head; that he said he had reduced
the wen in size by the use of alum; that this was
a discovery unknown to the medical world, and that
he thought he would make a name for himself and
family on account of such discovery. The testimony
further tended to prove that the testator complained
of a rumbling in his ears, and that he undertook to
cure his deafness by putting coal oil in his ears; that
at another time he applied coal oil to a number of

trees; the trees died, and when talked to about the matter, he said that he did not have any sense anyway. On one occasion a short time before making his will, he took his stallion and some colts to the neighborhood-church meeting for the purpose of exhibiting them. At another time when he attended church meeting he became dissatisfied because the preacher whom he expected to hear did not preach; he talked out loud to himself and said, "I wanted this other gentleman to speak because I wanted to hear him." One afternoon at a neighbor's house, where a number of neighbors were assembled, the testator insisted on making political speeches off and on during the meeting, and those present at the time testified that they thought him of unsound mind; that during election years he would make political speeches. One of the witnesses testified that at the age of seventy-nine he rode a young wild horse to his place of business, and when the witness tried to induce him to trade with him for a gentle horse, testator replied that he had as much right to own a good horse as witness. Some of the witnesses testified that the testator was childish, physically weak, and wabbled when he walked.

On cross-examination, one of the witnesses, Mr. Howard, a nephew of testator, testified that in November or December, 1900, while on a visit at the home of his uncle, testator talked with witness about his children and the advancements he had made to them; about his horses, cattle and farm, and in 1900, while showing witness a fine horse, called his attention to the fact that when witness visited him in 1899 he had a different horse; this witness further admitted that he borrowed money from the testator in 1899 or 1900, and that Mr. Karnes exerted himself to secure for witness a place to work. This witness further stated that in 1899, on a visit to his uncle, testator remembered his (witness's) mother, although it had been thirty-five years or more since

he had seen her.   On cross-examination Mrs. Winn
testified that hands were employed on the farm of her
father from time to time, and while she thought John
Karnes paid them most of the time, she would not
state that her father had not paid them.   This wit-
ness further stated that her father    took    stock to
market very often accompanied by his son.   Witness
Greenard testified on cross-examination that he had
been    transacting    business with Mr. Karnes for a
number of years, and that Mr. Karnes continued to
buy merchandise from him up to a short time prior
to his death in reasonably large quantities, and that
he carried on these transactions personally.   Another
witness, Mr. Saxton, upon cross-examination, testified
that on two occasions in the fall of 1900, Mr. Karnes
visited him to have apples ground into cider and that
he transacted the business as any other man would.
Another witness for plaintiffs, Mr. Modrell, testified
that he saw Mr. Karnes in the fall of 1900, and that
he was greatly troubled and worried, and had had
a serious trouble, and at that particular time, in his
opinion, Mr. Karnes did not have sufficient mind and
memory to execute a will, but that after that time he
met Mr. Karnes frequently, prior to the execution of
the will, and up to the time of his death, and that
after the one time spoken of by the witness    Mr.
Karnes was the same Sampson Karnes that he had
known from infancy, both in mind and body, except a
slight physical weakness from age.   Leroy Jeffries,
husband of Mrs. Jeffries, testified that he transacted
business with George S. Karnes up to the time of the
general "bust up" in 1900, and that after that time
he did not visit the home place or rent land from
Mr. Karnes as had been his habit in years past.
Although this witness testified that in his opinion the
testator did not have sufficient mental capacity to dis-
pose of his property intelligently at the time of the
making of his will, on cross-examination he stated that

after the trouble referred to he had no social or business relations with Mr. Karnes.

Dr. Johnson Densmore testified on behalf of plaintiffs that in his practice he confined himself to mental diseases and diseases of the nervous system generally; that he was familiar with the ingredients used in the preparation of Warner's Safe Cure and knew its effects, and that the taking of this medicine in large quantities had an injurious effect upon the mind and nervous system. In answer to a hypothetical question asked him he said: ''Without seeing the man and judging from the man himself, I would say, from your question, that he was mentally inefficient—mentally deficient to perform those acts in a reasonable way.''

It was also shown in evidence that there was trouble in the Karnes family, and that the testator had instituted suit against Clarence Winn, son of Mrs. Winn, and Sam Jeffries, son of Mr. and Mrs. Jeffries, plaintiffs in this cause, for the sum of twenty-five hundred dollars.

The evidence further disclosed that the testator had accumulated sufficient property to give his son, John N. Karnes, 320 acres of land, worth $90 per acre; his son Pascal Karnes, 240 acres of land, worth approximately the same amount per acre; that he had given each of his daughters land and money in large amounts, none of whom had received less than $2,000; that he had on hand at the time of his death $6,261.70 personal property, and was the owner in fee of about five hundred acres of land worth $100 per acre, and the city property devised to Mrs. Winn.

Plaintiffs offered in evidence a warranty deed dated July 9, 1885, from Thomas W. Rogers to Jennie Winn, conveying certain real estate which the testator had sought by his will to devise to Mrs. Winn. This evidence doubtless was introduced for the purpose of indicating that the testator was not fully aware of

the property that he owned. The record further discloses that the testator furnished the money to Mrs. Winn to purchase the land embraced in the Rogers deed. It is further disclosed by the record that the witnesses, Joseph H. Stock and G. Robert Heger, appointed to accompany and aid the executors in opening and examining the papers, moneys and other property of George S. Karnes, deceased, and make an inventory of them, embraced the land conveyed by Rogers to Mrs. Winn in the inventory and certified that they performed the duty assigned to them and that the inventory was full and complete.

While the foregoing does not give all the testimony in detail developed upon the trial, we repeat that we have read in detail all of the testimony as disclosed by the record and this statement sufficiently indicates the nature and character of the evidence which confronted the court when the demurrer to such evidence was interposed.

At the close of the evidence the defendants requested the court to instruct the jury that under the law and evidence in this case their verdict must be for the defendants. To this instruction the plaintiffs interposed objections, which objections were overruled, and the instruction as requested given to the jury. Whereupon the plaintiffs properly preserved their exceptions to the action and ruling of the court in giving such instruction. In obedience to this instruction the jury returned a verdict finding that the paper read in evidence was the last will and testament of George S. Karnes.

A timely motion to set aside the verdict and for a new trial in this cause was filed and by the court taken up and overruled. Judgment was entered in acordance with the verdict returned by the jury and from this judgment the plaintiffs prosecuted this appeal and the record is now before us for consideration.

## OPINION.

The record before us in this case presents to our consideration but one legal proposition, that is, did the court commit error in giving the instruction to the jury at the close of the evidence in the nature of a demurrer to such evidence, directing the jury to return a verdict for the defendants?

While our attention is directed to numerous complaints of error in the exhaustive briefs of learned counsel for appellants, yet such complaints in their last analysis are embraced in the main and overshadowing complaint that the court committed error in giving the instruction to which we have made reference. The grounds upon which the correctness of the instruction indicated is challenged may thus be briefly stated:

First. That the testimony developed upon the trial of this cause respecting the capacity and competency of the testator to make a will fully authorized the submission of that issue to the jury.

Second. That the testimony disclosed by the record sufficiently indicated that the will involved in this controversy was procured by the undue influence of certain beneficiaries in said will to warrant the trial court in submitting that question to the jury.

Finally, the complaint is made, though not directed to the propriety of the instruction referred to, that the court committed error in ignoring the ground alleged in the motion for new trial of newly-discovered evidence.

We will give to these complaints, in the order designated, such attention as their importance demands.

## I.

At the very threshold of the consideration of the proposition involved in this contest predicated upon the charge in the petition that the testator was not

possessed of sufficient testamentary capacity to valid-
ly execute the will indicated in the statement, it is well
that we keep in view the usual tests of capacity to
make a will disposing of property possessed by the
testator at the date of his death.  Judge MACFARLANE,
in Maddox v. Maddox, 114 Mo. 35, in a very practical
way treated of this proposition, and directed atten-
tion to what had been held by this court in other cases.
He said: "A witness was asked whether in his judg-
ment, from his knowledge and observation of the tes-
tator, he was in November preceding his death 'com-
petent to engage in or understand any complicated
business matter or transaction.'  An objection to the
question was urged on the ground that such com-
petency was not a proper test of mental capacity
requisite to make a will.  The objection being over-
ruled the witness answered: 'If I had any complicated
matter at that time I would not have been willing
to entrust it to him to settle or manage for me.'  It
is clear that the test here made of testamentary capac-
ity goes beyond what has ever been required under
the decisions of this court.  It is said in Brinkman
v. Rueggesick, 71 Mo. 556, by NAPTON, J., that 'it is con-
ceded in most of the cases that a man may be capable
of making a will, and yet incapable of making a con-
tract or managing his estate,' and in the case of Couch
v. Gentry (113 Mo. 248), it is said: 'If the testator
understood the business about which he was engaged
when he prepared and executed his will, the persons
who were the natural objects of his bounty, and the
manner in which he desired the disposition to take
effect, he was capable of making a will.'  Competency
'to engage or understand any complicated business
matter or transaction' requires too high a grade of
capacity when compared with what is required under
these decisions.  Under that test a majority of men
would be incapable of making a will."

Again we find the rule as to the test of capacity sufficient to make a will announced in Sehr v. Lindemann, 153 Mo. 1. c. 288. It was ruled in that case that upon making out a prima-facie case by the proponents of the will, it then devolved upon the contestants to establish incompetency or undue influence. The court, in announcing the rule in that case, used this language: "By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. . . . Mere opinions of witnesses that the testator was 'childish,' or acted 'funny,' or was 'worse than a child,' or that there were 'inequalities in the will,' unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.' "

This court in a long and unbroken line of decisions has unqualifiedly approved the test of capacity as indicated in the foregoing cases. [Riley v. Sherwood, 144 Mo. 354; Berberet v. Berberet, 131 Mo. 399; Defoe v. Defoe, 144 Mo. 458; McFadin v. Catron, 138 Mo. 197; Fulbright v. Perry County, 145 Mo. 432; Aylward v. Briggs, 145 Mo. 604; Hughes v. Rader, 183 Mo. 630; Sayre v. Trustees of Princeton University, 192 Mo. 95.]

The cases above cited have firmly settled the question as to the requisite test of mental capacity sufficient to execute a valid will. As was said by GANTT, J., in speaking for this court in Sayre v. Trustees of

Princeton University, supra, "the standard of mental capacity required to sustain a will has been fixed so far as judicial utterances can settle a principle, and it is that the testator must have 'had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom he desired to give it, and was giving it, without the aid of any other person,'" citing, in support of such rule, Crossan v. Crossan, 169 Mo. l. c. 641; Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248.

We have indicated the well-settled rule applicable to the test of testamentary capacity to validly execute a will, and the solution of the first proposition concerning the sufficiency of the mental capacity of the testator in the case now in hand to execute the will involved in this contest must be sought by a fair and impartial application of the testimony developed upon the trial to that question.

In treating of the complaint of appellants embraced in the first proposition, that the court committed error in its mandatory instruction directing the jury to return a verdict for the defendants, we are not unmindful of the well-settled rule in this State that a suit to contest a will is an action at law under our system, and that it is not within the province of this court to weigh conflicting evidence to determine whether the jury found against the weight of evidence. But on the other hand, we must not be unmindful that it has been uniformly held by this court that it is its province to examine the record to see if there any substantial testimony to authorize the submission of the cause to the jury. [Young v. Ridenbaugh, 67 Mo. 574; Appleby v. Brock, 76 Mo. 314; McFadin v. Catron, 138 Mo. 197; State ex rel. v. Guinotte, 156 Mo. 520-21; Crossan v. Crossan, 169 Mo. 631; Hamon v. Hamon, 180 Mo. 685.]

Directing our attention to the testimony applicable

to the first contention of the appellants, that is, that the testimony sufficiently indicated the mental incapacity of the testator, Mr. Karnes, to execute this will, to authorize the submission of that question to the jury, it is well to keep in mind the issue tendered by the pleadings to which the testimony was applicable. The issue tendered concerning the proposition now under consideration upon the allegations in the petition of the contestants, was that at the time of the execution of the alleged last will and testament deceased did not have sufficient mental capacity to make a will and did not have sufficient mental capacity to know or understand the nature of said instrument, or the effect thereof.

It is earnestly insisted by learned counsel for appellants that the evidence as disclosed by the record now before us made a case for the jury and that the trial court committed error in giving the instruction heretofore mentioned, directing the jury to find the issues for the defendants.

We shall not undertake to again repeat the testimony developed upon the trial of this cause. It is sufficient to say that we have carefully read in detail the testimony of all the witnesses embraced in the record before us and have briefly indicated the nature and character of that testimony, and after a most careful consideration of it we are unable to give our assent to the insistence of counsel for appellants. It is true that some eighteen or nineteen witnesses testified in behalf of the plaintiffs, and recited numerous instances where the testator some time prior to the execution of this will exhibited numerous eccentricities. It seems that Mr. Karnes had unbounded faith in the medical virtues of Warner's Safe Cure, used it to an excessive degree and recommended it to others with whom he came in contact, regardless of what their complaints consisted of.

It is not uncommon with men or women as they
advance in years that their habits and mannerisms
frequently change, and it is but common knowledge
that eccentricities often develop at an advanced age,
but this falls far short of a showing of mental un-
soundness sufficient to invalidate the execution of a
will.     While the excessive use of Warner's  Safe
Cure might have been injurious both to the mind and
body of Mr. Karnes, yet there is nothing strange or
remarkable that he should have implicit confidence
in its medicinal values and make the recommendations
of its curative properties as has been suggested.
Upon due inquiry there would be no difficulty in find-
ing a great many people of strong character and high
order of intelligence who entertain the same views
as to Warner's Safe Cure as the testator in this case
did.  His recommendations doubtless were in harmony
with certificates of numerous persons as to its cura-
tive properties which were to be found in the advertis-
ing matter which was contained in the wrappers around
each bottle of the medicine.  Numerous other witnesses
testified to eccentricities of the testator, such as his
always wanting to make political speeches, getting up
in the night and singing psalms in his room, taking
the house dogs and going hunting and returning with-
out any game, the exhibition of his stock at some
church meeting, his failure to recognize acquaintances,
a roaring in the head and disconnected conversations,
and others which we deem it unnecessary to repeat.
    Conceding, for the purposes of this case, that the
testator exhibited on various occasions the eccentrici-
ties as disclosed by the record, yet in our opinion, if
the comparatively recent well-considered cases by this
court  correctly  announce  the  law  as applicable  to
such state of facts, and are to be longer followed, then
it must be held that such state of facts is not recog-

nized by the law as showing a want of capacity to make a will, and it logically follows, if such eccentricities as testified to by the witnesses are insufficient to show a want of capacity then the mere fact that the witnesses predicated an opinion upon such a state of facts that the testator was of unsound mind gives no additional force to such facts.

In Von De Veld v. Judy, 143 Mo. 348, it was conceded that the record disclosed a competition of evidence on the point whether Judy was of sufficient mental capacity to make a will. Manifestly the showing on the part of the contestants in that case was equally as strong as the one in the case at bar. It appeared in evidence that Judy was filthy in person and habits; exposed his person before a lady; was forgetful of old friends; failing in memory; made frequent repetitions in his conversations; would get lost; was physically weak, which arose from long, continued sickness; impaired eyesight; extreme old age, together with other facts concerning his mental condition. In the discussion of the facts developed in that case this court said that ''the testimony introduced by the contestants was of a character not at all calculated to favorably impress the impartial mind with a very great or abiding sense of its probative force.'' Emphasizing the views of this court upon the character of testimony as introduced in that case, which is similar in some respects to the testimony of the contestants in the case at bar, in further treating of such testimony the court used this language: ''But even if the testimony on behalf of the contestants were much stronger than it is; much stronger indeed than that of the proponents of the will, still that would not be decisive of this case, and for these reasons: In the first place, the single issue tendered by the contestants in the will was, as heretofore stated: *'That at the time of its execution,* the said Resin S. Judy was not of sound and disposing mind and memory, and

was, by reason of his mental infirmities, incapable of devising his property.' On this charge, by their general denial, the proponents of the will joined issue. Although when a charge of insanity or imbecility is made against a testator, evidence is competent to show the condition of his mind long prior to and closely approaching the time of the will's execution, as well as the condition of his mind shortly subsequent to such execution, yet the purpose of such prior and subsequent testimony is only to indicate the state of his mind *at the very time* the execution of the will took place. That is the true time to try his mind. The fact of competency is to be decided by the state of the testator's mind *at the time* the will was made, and although evidence is always admissible of prior and subsequent occurrences as tending to shed light on the question of the state of his mental faculties and of his bodily health on the day of the will's execution, yet such evidence is only receivable for that purpose alone and is not otherwise to be regarded. [Saxon v. Whitaker, 30 Ala. 237; Harrison v. Rowan, 3 Wash. C. C. 586, and other cases cited in that first mentioned.]'' It was expressly ruled in that case, under the facts developed upon the trial, that a demurrer to the evidence should have been sustained.

Our attention is directed to the testimony of the expert, Dr. Densmore, and great stress is laid upon his testimony as furnishing a sufficient ground to submit this case to the jury. After a most careful consideration of this expert testimony we are of the opinion that it falls far short of furnishing any satisfactory or substantial proof of the want of sufficient capacity in the testator at the time of the execution of this will to validly execute the instrument disposing of the property that he possessed. It will be observed that the doctor did not claim, under the facts in this case, that the testator was suffering from any well-defined form of insanity, and it is significant how

guarded he was in answering the hypothetical question propounded to him. He did not say that upon that state of fact the testator was insane, but his answer was simply this: "Without seeing the man and judging from the man himself, I would say, from your question, that he was mentally inefficient—mentally deficient to perform those acts in a reasonable way." It will further be observed that the hypothetical question does not embrace testimony of other witnesses who testified as to his transacting business. It may be that the doctor's conclusion, assuming the facts to be true that the testator was mentally inefficient in some respects, was correct, yet it must not be overlooked that the testator's mental capacity might have been inefficient to the extent even of being incapable of making a contract or managing his estate, yet, as expressly ruled by this court in Brinkman v. Rueggesick, and Couch v. Gentry, supra, it is conceded in most of the cases that a man may be capable of making his will and yet incapable of making a contract or managing his estate. If the testator understood the business about which he was engaged at the time of the preparation and execution of his will, the persons who were the natural objects of his bounty and the manner in which he desired to dispose of his property, he was capable of making a will, and the fact that he was unable to engage in or understand any complicated business matter or transaction would not be sufficient to invalidate such will.

The case of Sayre v. Trustees of Princeton University, in many of its features, presented a much stronger showing on the part of the contestants than in the case at bar. In that case there were four expert witnesses who testified as to the mental unsoundness of Doctor Sayre, and what was said by Judge GANTT in the discussion of the expert testimony is so applicable to the expert testimony of Doctor Densmore which is now under consideration and so clearly ex-

presses our views upon the proposition that we here
quote his discussion concerning such testimony:
"Medical men of great learning maintain that a mind
diseased on one subject must be classed as unsound,
but the law of this State is too well settled to be
gainsaid that a man's mind may be impaired in one
faculty and practically unimpaired in all others. De-
rangement of mental faculties does not incapacitate
one under our laws from making a will, if it does not
render him unable to transact his ordinary business,
and incapable of understanding the extent of his prop-
erty and of appreciating the natural objects of his
bounty. We have incorporated the principal hypothe-
tical question propounded to the experts and it is ap-
parent that many, if not all, of the facts assumed
are entirely consistent with mental soundness. Those
that tended in the least to show aberration were wholly
detached from the more pertinent and important evi-
dence which completely negatived the evidence of ec-
centricity or any mental unsoundness. It did not in-
clude the principal and controlling facts, but we are
not bound to accept an opinion based upon facts which
the law will not and does not recognize as showing
a want of capacity to make a will. Conceding, as
already said, that an expert might hold the view that
Doctor Sayre was of unsound mind in some respects,
the question and answer both fell short of the legal
test of capacity to make a valid will in this State."
One of the strong features in the Sayre case was that
Doctor Sayre had some years previous to the execution
of his will been suffering from a well-defined form of
insanity, melancholia. In that case the hypothetical
question, which was very full, was propounded to the
four expert witnesses, and each of them answered
that in their opinion, assuming the facts embraced
in the hypothetical question to be true, the testator
was not capable of making a will. We have again
reconsidered the Sayre case, and obviously it presents,

as heretofore stated, in many of the leading features, a much stronger case to go to the jury than the case at bar, and in our opinion that case correctly announced the rules of law applicable to the subject under consideration, and there is no valid legal reason why it should be departed from.

In Archambault v. Blanchard, 198 Mo. 384, it was sought to annul the last will and testament of an old gentleman residing in Kansas City by the name of Benoist. Numerous witnesses were introduced who detailed many eccentricities which had developed in this old gentleman, and this court in the discussion of the case conceded that after the date of the street car accident, February 20, 1899, which happened to befall Mr. Benoist, there was evidence to establish certain eccentricities and peculiarities, and some of them were pointed out by the court in passing upon the case. Speaking of Mr. Benoist, it seems "he was inclined to be agnostic in his religious opinions; that he was addicted to drinking intoxicating liquors and would get under their influence to such an extent that in the afternoon he would be incapable of transacting business, and would refuse to do any business in the afternoon; that he would on various occasions scold and drive away the negro man who served about his premises, the evidence showing that the negro himself was often drunk; that his general physical health declined and his memory failed, and he would be given to fits of temper that witnesses had not observed in former years. There was evidence also that in the year before his death he had erected a monument on his lot in the cemetery in Baxter Springs and had his grave dug and lined with granitoid, and said that when he was dead he wanted his body cemented in this grave; that he also had the carpenter make his coffin and directed there should be no nickel-plated handles put on it. . . . All these eccentricities and peculiarities in connection with the evidence as to his indulgence

in intoxicating liquors to an excess in the last days
of his life, was submitted to an expert witness, and he
testified upon that hypothetical question that he would
say that the testator was insane at the time of the
execution of the will in contest.'' In that case, as
in the Sayre case, notwithstanding the testimony of
the expert witnesses and the many eccentricities and
peculiarities of the testator as testified to by the wit-
nesses, it was held that there was no substantial evi-
dence upon which to authorize a submission of the
case to the jury.

Our attention is also directed to the fact that
the testator in his will devised certain land to his
daughter, Mrs. Winn, that she had had a warranty
deed to since 1885. It is argued from this fact that
at least it is a strong indication that the testator did
not have knowledge of the property he owned. This
fact is of but little significance when the entire dis-
closures of the record are considered. The testator
furnished Mrs. Winn the money with which to buy this
land, and it may be by reason of the fact of having
furnished the money to purchase the land he thought
he had an interest in it, therefore doubtless he thought
that, having given the money to his daughter to make
the purchase, there was nothing inappropriate in mak-
ing sure that there would be no claim of this land by
any of his children, and that, therefore, he would sim-
ply devise it to her in his will. Moreover, the two wit-
nesses who accompanied the executor, evidently con-
sidered the land as belonging to the testator, for they
placed it in the inventory, and certified that it was a
full and complete inventory of his property, and that
they had fully discharged their duty as such witnesses.
This occurrence concerning this piece of land clearly
has but very little to do with the question as to the
capacity of the testator to execute a will.

Our conclusion, after a very careful consideration
of all the evidence in detail disclosed by the record, is

that Mr. Karnes at the time he executed this will was entirely capable of making a valid will. He went to the office of Judge Ramey without being accompanied by anyone and had his will prepared. The provisions of the will speak for themselves, and indicate very clearly that he had the business about which he was then concerned fully in hand. He seems to have not forgotten the names of any of his children, and clearly recalled what he had done for them in the past, and made mention of the fact in his will that he gave more to his son John for the reason that he had worked for him many years after he became twenty-one years of age without pay, and that he desired in some measure to compensate him for his services. He had this will witnessed and two of those witnesses testified very clearly as to their observations of his mental capacity to execute the will. One of them had known him for thirty-five years; the testator and his family had purchased goods at his mercantile house, and while the other witness had had no acquaintance with him, yet he observed him and at the time that he executed the will positively stated that he was entirely rational. In addition to this we find that some of the witnesses for the plaintiffs, who upon their examination in chief expressed the opinion that the testator was not of sound mind, upon their cross-examination in answer to questions propounded testified to a state of facts which would indicate that he was of sound and disposing mind. Witness Mr. Howard, a nephew of the testator, testified that in November or December, 1900, while on a visit at the home of his uncle, testator talked with witness about his children and the advancements he had made to them; about his horses, cattle and farm, and in 1900, while showing witness a fine horse, called his attention to the fact that when witness visited him in 1899 he had a different horse; it was further admitted by this witness that he borrowed money from the testator in 1899 or 1900, and that Mr. Karnes exerted

himself to secure for witness a place to work. It seems that whatever the opinion of this witness may have been as to the mental capacity of Mr. Karnes, he evidently thought that the testator had sufficient capacity to at least contract with him for the loan of over five hundred dollars. This witness further stated that while on a visit to his uncle in 1899, testator remembered his (witness's) mother, although he had not seen her for thirty-five years or more. Another witness, Mrs. Winn, testified on cross-examination that hands were employed on the farm of her father from time to time, while she thought John Karnes paid most of them most of the time, she would not state that her father had not paid them. This witness further stated that her father took stock to the market very often, accompanied by his son. Witness Greenard testified on cross-examination that he had been transacting business with Mr. Karnes for a number of years, and that Mr. Karnes continued to buy merchandise from him up to a short time prior to his death, in reasonably large quantities, and that he carried on these transactions personally. Mr. Saxton upon cross-examination also testified that on two occasions in the fall of 1900, Mr. Karnes visited him to have apples ground into cider, and that he transacted the business as any other man would. Another witness for plaintiffs, Mr. Modrell, testified that he saw Mr. Karnes in the fall of 1900, and that he appeared to be greatly troubled and worried, and he had had a serious trouble, and at that particular time, in his opinion, Mr. Karnes did not have sufficient mind and memory to execute a will, but after that time he met Mr. Karnes frequently, prior to the execution of the will, and up to the time of his death, and after the one time spoken of by the witness Mr. Karnes was the same Sampson Karnes that he had known from infancy, both in mind and body, except a slight physical weakness from age. Another witness for the plaintiffs, a son-in-law of the testator,

Leroy Jeffries, testified that he transacted business with George S. Karnes up to the time of the general "bust up" in 1900, and after that time he did not visit the home place or rent land from Mr. Karnes as had been his habit in years past. This witness gave it as his opinion that the testator did not have sufficient mental capacity to dispose of his property intelligently at the time of the making of his will; however, on cross-examination he stated that after the trouble referred to he had no social or business relations with Mr. Karnes.

In conclusion upon this proposition, we are of the opinion that there is an entire absence of satisfactory and substantial testimony tending to show such want of sufficient mental capacity at the time of the execution of the will in controversy as would authorize the court to submit that issue to the jury. While it may be conceded that the testator was eccentric and peculiar in many respects, and that these eccentricities and peculiarities were made manifest in the manner and at the times and places designated by the witnesses, however, we must not overlook the settled rule as applicable to this subject. As was said in Sehr v. Lindemann, 153 Mo. l. c. 288, "By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. . . . . Mere opinions of witnesses that the testator was 'childish,' or acted 'funny,' or was 'worse than a child,' or that there were 'inequalities in the will,' unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of in-

competency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.'"

II.   This brings us to the second proposition presented to our consideration in this case, that is, the sufficiency of the testimony disclosed by the record to authorize the court to submit the issue tendered in the pleadings as to whether or not this will was procured by undue influence.

The rules of law applicable to this proposition are well-settled by a long line of decisions in this court. The expression of opinion has been uniform that the influence exercised upon a testator sufficient to invalidate his will must be of such a nature and character as amounts to overpersuasion, coercion or force, destroying the free agency or will-power, as contradistinguished from merely the influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected and trusted by the testator.

It is sufficient to say upon this contention that there is an entire absence of any testimony which would authorize the court to submit that issue to the jury.   The testimony directed to that   question is simply this, that John N. Karnes, son of the testator, attended to part of the testator's business; undertook to aid him in the management of his large estate. Mrs. Tull, daughter of the testator, was simply giving to her father such attention and care as any kind and dutiful daughter would under the circumstances have done.   The record discloses, and it must be conceded, that the testator did not equally distribute his property under this will.   Mrs. Winn and Mrs. Jeffries received at the hands of their father a very small share of his estate remaining at the time of his death.   It is true, however, that during his life time he had made advancements to all of his children.   This unequal distribution is not sufficient to establish undue influence.

It was expressly ruled in McFadin v. Catron, 138 Mo. 197, that inequalities in the disposition of the property by the testator, giving to one child or children more than to another, are not sufficient grounds for setting aside a will, even though the testator gives nearly all of a very large estate to one of the children.

There is nothing significant from the fact that John Karnes attended to a great deal of the testator's business, and was intimately associated with him. Those were but the natural acts of a son who represents his father, and should not be distorted into sufficient evidence of an exercise of undue influence. The same may be said as to Maggie Tull, the daughter of the testator. She was kind to her father and nursed him in sickness, and that is no more than what she or any other daughter would be expected to do under the conditions existing.

The record discloses that there was some trouble in the family of the testator. As to what that trouble was we know not, nor do we care to know. It may, however, at least shed some light upon the unequal distribution of the property of the testator by his will.

There is no necessity for further discussing this proposition. The testimony was insufficient to authorize the submission of that issue to the jury. Inequality alone in the disposition of the testator's property is not sufficient to establish that the will was procured by undue influence. In order to authorize the submission of that question to the jury there should be at least some substantial and satisfactory proof that the will was procured by coercion or by importunity that could not be resisted, and that by such coercion and importunity the execution of the will was procured. The testimony upon this proposition did not tend to make any such showing as is required under the law, hence the ruling upon this contention must be adverse to the appellants.

III.  This brings us to the final contention, that the trial court erred in overruling the plaintiffs' motion for a new trial upon the ground of newly-discovered evidence.

It will suffice to say upon this contention that the record discloses that the plaintiffs in their motion for new trial did not embrace the newly-discovered evidence or the names and addresses of the witnesses who would testify to such newly-discovered evidence.  It is further disclosed by the record that the motion for new trial was not sworn to.  The allegations in the motion for new trial respecting the newly-discovered evidence clearly do not conform to the well-settled rules announced by this court upon that subject.  The rule applicable to the requisite allegations in a motion for new trial upon the ground of newly-discovered evidence is firmly settled in this State, and applying this rule to the allegations in the motion for new trial in the case at bar manifestly the question of the propriety or impropriety of granting or denying a motion for a new trial upon that ground is not properly preserved for review by this court.

In the recent case of King v. Gilson, 206 Mo. 264, this proposition was exhaustively reviewed by Judge Woodson, and it was expressly held that the question of newly-discovered evidence, under the disclosures of the record, which was substantially  similar to the record in the case at bar, was not preserved for review by this court, hence was not before the court for consideration.  [State v. David, 159 Mo. l. c. 535; State v. Welsor, 117 Mo. l. c. 582; State v. Ray, 53 Mo. l. c. 349; State v. McLaughlin, 27 Mo. 111; State v. Rockett, 87 Mo. 666; State v. Butler, 67 Mo. l. c. 63.]

We have herein given expression to our views upon the main propositions disclosed by the record. The testator had by a life of energy and industry accumulated the property of which he died possessed, and unless we are willing to absolutely ignore the statute

concerning wills, we see no escape from the conclusion that he had the right to dispose of such property in such manner as he saw proper.

A review of the comparatively recent cases by this court demonstrates that the right guaranteed to every property-owner by the laws of this State to dispose of his property as he may deem proper is no longer to be considered a mere idle legislative expression, but that the statute means what it says and is full of force and vitality. It is plainly made manifest in the numerous well-considered cases by this court that the right of the owner to dispose of his property by will is fully recognized and if it be found that he is of sufficient testamentary capacity his disposition of the property he owns will be upheld, and the interference with the exercise of this right by others with whose views the disposition made by the testator did not happen to accord, will not meet with the approval or sanction of this court.

Entertaining the views as herein indicated the judgment of the trial court should be affirmed, and it is so ordered.

All concur.