HAMON et al. v. HAMON et al., Appellants.

Division One, March 17, 1904.

1. WILL: Capacity of Testator: Prima Facie Case. One of the subscribing witnesses to the will, when asked to state what was the mental condition of the testator at the time they witnessed the will in his presence at his request, said, "Very good as far as I know," and on cross-examination that "his mind was just as sound as any man's could be at the time," and the other stated, "It was good, what I could see." *Held*, that this evidence made out a prima facie case for the proponents.

2. ———: ———: Opinion of Witness. It is not competent for a witness to give an opinion as to whether or not the testator had mental capacity to make a will. That is the question the jury is to determine.

3. ———: ———: Degree of Intelligence. The law does not require the high degree of intelligence to make a will that is necessary in some other matters. The test is that the testator have sufficient mental capacity to understand the nature and character of his property, the natural objects of his bounty, and the disposition he is making of his estate by the will.

4. ———: ———: Condition of Bank Account. The fact that a farmer eighty years old, worth eighteen or twenty thousand dollars, did not know the condition of his bank account, and that a note for something like $100, which had been due for several years, had been paid by the sureties, and the amount placed to his credit, do not indicate that his mind was unsound.

5. ———: ———: Senile Dementia: Desire to Marry. The fact that an old bachelor, eighty years old, desired to marry, and did marry a young woman twenty-five years old, if there was no impropriety in his conduct towards women, and no lack of respect towards the young women of his acquaintance, and the desire was prompted by a wish for some one to care for him in his old age, is not sufficient to establish senile dementia.

Hamon v. Hamon.

6. ———: ———: ———: **Assumption of Craziness in Question.** A hypothetical question which assumes that the testator "was practically crazy on the subject of women" should be excluded. The answer of an expert that the disease under which the testator was laboring is "senile dementia" only substitutes a technical name for the condition described by the question, and throws no light on that condition.

7. ———: ———: **Evidence Tending To Show Senile Dementia.** Evidence tending to show senile dementia on the subject of a desire for women and that a testator so afflicted would be liable to be controlled by the influence of women, falls short of showing incapacity to make a will giving his property to his wife, and will not authorize the court to submit the question of his incapacity to the jury in the face of the proponents' prima facie case that he was of sound and disposing mind at the time of making the will; for, although a testator may be demented on that subject, and may be old and feeble in mind and body, and childish, yet if he has mind and memory enough to know what property he has, how he wants to dispose of it, who are the objects of his bounty, and the disposition he is making of his property by the will, he has capacity to make a will.

8. ———: ———: ———: **Undue Influence: Appellate Practice.** Such evidence in so far as it indicates that the testator may be controlled by the influence of women, does not bear on the question of incapacity, but of undue influence; and if the court by instruction tells the jury there is no evidence of undue influence, and there is no appeal therefrom, that question will not be considered on appeal.

9. ———: ———: **No Evidence: Practice.** Where there is no evidence that the testator did not possess mental capacity to make a valid will, the court should so declare, and take that question from the jury.

Appeal from Platte Circuit Court.—*Hon. A. D. Burnes,* Judge.

REVERSED AND REMANDED (*with directions*).

*James W. Coburn, Anderson & Carmack* and *George W. Day* for appellants.

(1)    When the formal execution of a will according to the requirements of the statute is shown, as was done in this case, and the subscribing witnesses testify to the

sanity of the testator and he is of proper age to make a will, a prima facie case in favor of the will is made, and it then rests upon the contestants to overcome the prima facie case by substantial evidence. Carl v. Goebel, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197; Von de Veld v. Judy, 143 Mo. 348; Fulbright v. Perry County, 145 Mo. 442; Sehr v. Lindemann, 153 Mo. 276. (2) By competency in a testator is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons he makes the beneficiaries of his bounty. If he has sufficient intelligence remaining to fulfill this definition, imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information, will not be sufficient to establish his incompetency. Old age and physical infirmity do not constitute incapacity to make a will. If a testator has the competent possession of his mental faculties, he may "freely make his testament, however old he may be." Van Alst v. Hunter, 5 Johns. Ch. 248. And in Eddy's Appeal, 109 Pa. 406, a will was sustained though the testator was 101 years of age, wholly blind and partially deaf. "The law," says Chancellor KENT, "looks only to the capacity of the mind, and neither age nor sickness, nor extreme distress or debility of body, will affect the capacity to make a will if sufficient intelligence remain." Guild v. Hull, 127 Ill. 523. From the mere fact of the testator's advanced age no inference can be drawn unfavorable to the will. Cornwell v. Reker, 2 Dom. 366. (3) Mere opinions of witnesses that the testator was "childish" or acted "funny," or "was worse than a child," or that there were inequalities in the will, unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make a case of mental incompetency, when the testimony shows that the testator knew what he was doing and to whom he was giving·

his property.  Sehr v. Lindemann, supra; Aylward v. Briggs, 145 Mo. 604; Riley v. Sherwood, 144 Mo. 364; McFadin v. Catron, supra; Von de Veld v. Judy, supra. (4)  The law presumes that a testator was possessed of a sound and disposing mind, and it rests upon him who disputes the validity of a will to overcome this presumption by persuasive evidence.  Jackson v. Hardin, 83 Mo. 186.  When there are facts established from which the jury may reasonably draw legitimate inferences tending to sustain an issue, the trial court should not interfere.  But where there is no substantial evidence of incompetency, it is the duty of the trial court to direct a verdict for the proponents of the will.  Sehr v. Lindemann, 153 Mo. 289; Defoe v. Defoe, 144 Mo. 458; Cash v. Lust, 142 Mo. 630; Riggin v. Westminster College, 160 Mo. 570; Berberet v. Berberet, 131 Mo. 399; Wood v. Carpenter, 166 Mo. 406; Crowson v. Crowson, 72 S. W. 1065; Southworth v. Southworth, 73 S. W. 133.  (5)  The competency of a testator to make a will is to be decided by his state of mind at the time the will was made, and to shed light on its condition; then evidence showing the condition of his mind long prior thereto and closely approaching and shortly subsequent to its execution is competent, but such evidence should be admitted for no other purposes.  Von de Veld v. Judy, supra.  (6)  The opinions of non-expert witnesses as to testamentary capacity must not be founded upon the testimony of other witnesses, nor upon hearsay nor upon a hypothetical case, but upon their own observation.  Appleby v. Brock, 76 Mo. 314; Sharp v. Railroad, 114 Mo. 100; Crowe v. Peters, 63 Mo. 429; Morse v. Morse, 67 Mo. 192; Chicago v. McGiven, 78 Ill. 349; Linn v. Sigsbee, 67 Ill. 75.  (7)  Where the mental condition of a testator is thoroughly established *aliunde,* medical speculations relating thereto are entitled to but little weight.  Rankin v. Rankin, 61 Mo. 295.  (8)  In a proceeding to contest a will on the ground that the testator was not of sound and disposing

mind, declarations of the testator as to his reasons for making the disposition of the property contained in the will are admissible for the purpose of showing the mental condition of the testator and the state of his affections, whether made before or after the execution of the will, but they are not evidence of the facts stated. Rule v. Maupin, 84 Mo. 587; Thompson v. Ish, 99 Mo. 170.

*Wilson & Wilson, James H. Hull* and *James W. Boyd* for respondents.

(1) There is an abundance of evidence tending to show that Mr. Hamon did not have sufficient mental capacity to make a will; that issue was properly and legally submitted to the jury; it was the exclusive province of the jury to determine it; and this court will not in such case interfere with their verdict. The trial court committed no error against appellants in its rulings in admitting or rejecting testimony. (2) The trial court erred in excluding testimony offered by respondents. . The testimony here referred to was in rebuttal, but if not rebuttal in character, it should, under the peculiar circumstances, have been admitted. Both the witnesses were parties to defendants' fraud, and one of them is a defendant. They ought, in all good conscience, to be willing to testify, and Mrs. Hamon ought to desire their testimony. State v. Brown, 63 Mo. 442; Feary v. Railroad, 162 Mo. 94. It evinces a fraudulent turn of mind on the part of Mrs. Hamon and her brother to strive to prevent her brother, a defendant, and Mrs. Beller, both charged with fraud, from testifying. (3) When a party is charged with fraud and fails to appear and testify, such failure carries with it unfavorable and damaging presumptions. Defendants Margaret Hamon and her brother declined to testify, both charged with fraud. Ins. Co. v. Smith, 117 Mo.

294; Goldsby v. Johnson, 82 Mo. 602; Leeper v. Bates, 85 Mo. 224. (4) The proponents of the will did not even make out a prima facie case of its execution by a person of sound mind and disposing memory. Riggin v. Westminster College, 160 Mo. 579. (5) The testimony on the part of the plaintiffs, who are respondents, proves or tends to prove that the paper writing purporting to be a will was obtained by fraud and undue influence, and that the deceased was at the time the paper was signed not of sound mind and disposing memory, and not capable of making a will. A part of the testimony of the appellants tends to support the same theory. The question of the mental capacity of the deceased to make a will was, under the evidence, properly submitted to the jury, and the jury was properly and legally instructed on that issue, and their verdict is conclusive.

VALLIANT, J.—This is a will contest. The testator, John Hamon, was a bachelor until he was eighty-three years old, then he married a woman of twenty-five years. He was married August 2, 1899. The will was made August 17th, and he died in November of that year. His estate was estimated at $18,000 or $20,000. It consisted chiefly of a farm of 293 acres in Platte county. By his will he gave all his property (except nominal bequests) to his wife, and named her brother to be the sole executor without bond. His heirs were a brother and sister and the children and grandchildren of deceased brothers and sisters. They are the plaintiffs in this suit; the defendants are the widow and the executor.

The petition assails the will on three grounds: fraud, undue influence, and lack of testamentary capacity.

At the conclusion of the evidence the court instructed the jury that there was no evidence of fraud or

of undue influence, but submitted the case to the jury on the question of lack of testamentary capacity.

The verdict of the jury was that the paper propounded was not the will of John Hamon. There was a judgment in accordance with the verdict. From that judgment the appeal is prosecuted.

The record in this case covers 352 printed pages, and it justifies the statement in the brief of counsel for appellants that "the evidence took a wide range." Much of it, however, was aimed at the charges of fraud and undue influence, which charges having been cut out of the case by instructions, we are left to deal with the evidence only relating to the allegation of lack of mental capacity to make a will.

In support of the will the defendants introduced the two subscribing witnesses, J. A. Beller and T. A. Breen, the latter being a brother of Mrs. Hamon, the widow. These men testified to the effect that they had been notified that they were desired to be present on that day at the house of the testator to witness his will; that Beller arrived first, in company with a neighbor named Mr. McGeehan, and they with the testator sat out in the yard until Breen arrived; then they remained a short while under the trees, talking and eating watermelons and apples; the testator then went into the house and in a few minutes returned and requested the two witnesses to go into the house with him, saying that he had some business to transact, and at the same time requested Mr. McGeehan to remain seated until they should return; the three went into the house together, and after they were in the room the testator went to a drawer, which he opened, took out the paper in question, and said to the two witnesses that it was his will and that he desired them to witness its execution; he then signed it in their presence and requested them to sign it, which they did in his presence and in the presence of each other; both testified that he was at that time of sound mind. Some question is made as to the

form of their expressions on this point. Beller when asked to state what the mental condition of the testator was, said, "Very good as far as I know," and Breen said, "It was good, what I could see." Whatever was equivocal in those words was made clear in the further examination and cross-examination of the witnesses. Beller subsequently said, "His mind was just as sound as any man's could be at the time." The defendants made their prima facie case.

The plaintiffs' evidence was to the following effect:

The deposition of the surviving brother of the testator went to show that the testator was on terms of affection with him and his sister, and that there were no hard feelings in the family; as to the sister she was an invalid, and, "they were very deeply endeared to each other as brother and sister and my understanding was he intended to leave his property to her; she is a very poor and very needy woman." Other depositions of members of the family gave the names of the descendants of the deceased brothers and sisters, and tended to prove that the testator was on good terms with his relations.

The testator was a native of Kentucky, but had lived forty years or more in Platte county. His relations lived in Kentucky. Until the last year or two of his life he was a man of vigorous body and good mind. He attended to his own business, was fond of going to church, and of reading the Bible, paid close attention to the sermon, and was fond of discussing it, and repeating it; showed no inclination for female society, but when he got past eighty years of age, he changed in that respect. He showed a desire for society of young women, particularly girls of eighteen or thereabouts; when he would go to church, instead of taking his former usual seat, he would take a position where he could look at the girls, and when afterwards questioned about the sermon, he would confess he re-

membered little of it. He proposed marriage to several young girls, and became the subject of gossip in that particular.

One of the non-expert witnesses, Canby, said, "Why he was crazy over women, was the condition of it." On further examination, after referring to the testator's fondness for young women, he said in reference to his inclination to get married: "Sometimes he would say he didn't want to marry; he had got too old; then again he talked like if he could marry some middle-aged woman, to be good to him and take care of him in his old days, it would be a great benefit to him." The witness was asked his opinion of the condition of the man's mind as derived from talks with him on the subject of marriage, to which he replied, "Well I don't know hardly how to answer that." Further pressed to answer if in his opinion the man's mind was sound he said, "No, sir; in my opinion he wasn't for six months before he died." When on cross-examination he told of business dealings he had with the testator during the last months of his life he was asked:

"Q. Dealing with him right along at the time you thought he was an insane man? A. Yes, I did. I never said he was an insane man.

"Q. Didn't you say he was crazy? A. No, sir.

"Q. Didn't you say he was crazy the last six months of his life? A. No, I never said he was insane, I said his mind was affected.

"Q. What do you mean by that? A. There is a good deal of difference between an insane person and a man whose mind is a little affected."

This witness testified that the testator was subject, during the last year of his life, to spells of cramping in the chest, and for a day or two after such spells, would be nervous and flighty and was trembly. He was asked to relate the circumstance of the testator's getting lost one night coming home from church and said: "So far as I know is what he told me: he went to church at night

and started back home, and he said he had some kind of a spell and couldn't see, so he sat down to rest a few minutes. He had to cross two or three little branches and so he came to one and thought that was the one going to his house and he went along and got into another man's corn field. He said he started through the woods and lost his shoe and stocking, but he found his stocking afterwards. He said he passed my house about one o'clock at night." That incident was also detailed by other witnesses for the plaintiffs.

Several of the witnesses for plaintiff also testified that the old man had a wind mill on his farm for pumping water and that he used to sit for hours under a tree watching the operation of the wind mill. Others mentioned small business transactions, such as the purchase from the testator of a cow and of eighty or ninety bushels of weevil-eaten wheat, in which transactions they obtained such advantage that they thought he was incapable of transacting business.

Mr. Wells, a banker, who had known the testator and had had business with him for several years, testified that he noticed a change in him in the last two or three years of his life. "He struck me as a man who was getting old, weakening from age." "Well, I don't think during the last few times that he was at the bank, he was fit to transact financial business." The witness was asked if the old man was capable of making a will and was told by the counsel that in answering the question he must assume that one capable of making a will "must have sufficient mental capacity to understand the nature and character of his property, the natural objects of his bounty, what disposition he would be making of his property and how he was disposing of it by will." He answered, "Some of those things I don't think he could do; some of them he might, I don't know." Further answer being insisted upon he said, "I don't think he knew enough about his financial affairs to make an intelligent will, if that is what you

are driving at.'' The witness then related the follow-
ing incident which convinced him that the man was unfit
to attend to financial business: The old man had left
in the bank for collection a note on which there were
three sureties, the principal was regarded as insolvent,
and when he was pressed for payment, he used to go to
Hamon and ''beg off.'' Finally, after the note had run
several years the sureties paid it and the money was
placed .to the credit of Mr. Hamon in the bank. The
deposit was not made by him in person. The collection
was effected through Mr. Wells and one of the sureties.
After that in July, 1899 (the will was made in August,
1899), the old man was at the bank and inquired about
his account and showed that he did not know that the
money from the note was to his credit. The witness
said: ''He came there and talked a few minutes like he
always did and then asked about his bank account, and
he discovered that he had more money, at least it de-
veloped that he had more money, than he supposed he
had. He did not know anything about it and at first
I could not get him to understand what it was, but finally
upon my explaining about the money he had there, he
said he recollected it, and that it was all right and went
away. He gave a check for some lumber that day, the
lumber came to about $75, and he had $108.66 that he
was lost out on. Q. He had lost that money out of
his memory? A. So it seemed; he had in the neigh-
borhood of one hundred dollars more than he supposed
was there. Q. Now, did you talk with him in regard
to that? A. Yes, sir; and that is what I principally
made my other statement from, because he didn't seem
to know about his business; I didn't think then that he.
was capable of attending to his own business; I just
supposed it was from old age; I didn't know there was
anything else the matter with him.'' On cross-examina-
tion he was asked: ''Do I understand you to say he
was unfit to make a will? I don't think I said that ex-
actly. What did you say? I said some part of that

statement there that seem to be necessary to make a will I don't think he could do. What is your understanding of the legal requirements? I caught the idea from that statement there, that it was necessary he should have a knowledge of his financial affairs and his property and money, and that I don't think he had.'' In answer to further questions he said that he supposed a man to be competent to make a will should be competent to transact ordinary busisess, and if that was not the legal requirement he did not know what was. The incident referred to by this witness in which the testator did not know he had so much money in bank was also detailed by Canby, another witness for plaintiff.

Other witnesses mentioned incidents of · trivial character showing that the old man had grown forgetful; several of them said he had grown childish, but the point on which they chiefly dwell was his infatuation for young women.

The plaintiff introduced two physicians as experts, to one of whom this question was put: ''Suppose a man to have arrived at the age of 81, 82 or 83 years, to be a bachelor, never having been married, and at that time in his life he takes up the idea, or has the idea, of marrying almost every young girl he knows, and does make proposals of marriage to different ones and is practically crazy on the subject of marriage. Suppose also his memory has deteriorated to some extent. Now how would you account for this excessive desire of marriage? And suppose also that for a year or about that time he would have spells of severe pain in his chest and would be nervous and shaky and trembling, now in that condition how would you, as a doctor of medicine, account for this disposition?'' The defendants' objection to the question being overruled and exception taken, the witness said: ''Well, doctors are better at asking questions than they are at answering them. If I had to answer in one word I should say, of

course never having seen the man and knowing nothing about it only what you have told me, if I had to name the case exactly I would call it senile dementia, if I had to name it one way or the other.'' On further examination the witnesses said that the authorities recognized that the desire of old men for women was a symptom of senile dementia.; that a man might be insane on one subject yet sane on others, but that in his opinion a man can hardly be wholly insane on any subject and perfectly sound on other subjects.

The other expert to whom a similar question was put said: ''Well in a general way I would think that it showed that there was some deterioration of the brain, the acts would show that.''

The witness also said that a mind unsound on one subject would be classed as an unsound mind, and that an old man in the condition indicated in the question would be under the controlling influence of a woman.

Defendants in rebuttal produced a large number of witnesses who testified that the testator was of sound mind, showing unusual preservation of both mind and body in a man of his great age. Even the subject of his determination to marry was by the evidence of these witnesses given a more rational aspect. It was shown that he advised with his intimate friends about it, some of whom joked him on the subject, and the substance of what he said was that he was old and alone, so far as family was concerned, and felt the need of some one to take care of him; that his relatives in Kentucky took no notice of him and would not until he was dead; therefore, if he could get a good woman to marry him he thought it would be the best thing he could do. We do not deem it necessary to give even an epitome of the testimony of the defendants' witnesses, but as one of them, McGeehan, was at his house on the day on which the will was executed and had considerable conversation with him we will note that he testified that the old man

appeared remarkably well and was a man of more than ordinary intelligence.

If we take out of the evidence for the plaintiff that which relates to the testator's conduct toward young women there is nothing which can raise a suspicion of unsoundness of mind. The incidents of forgetfulness were of trivial concern, relating to such matters as might escape the memory of anyone, especially of an old man whose life had not been spent in the worship of money, and to whom small business affairs are not held in supreme esteem. His losing his way on a certain night when he was returning from church does not justify the inference that he had lost his mind. In the first place, whilst it was a way over which he had often passed, yet it was not the open road, but a nearer path through the woods. All that the witnesses knew of it was what he told them himself. His mind was clear enough to remember the circumstances and explain how it occurred. The evidence showed that there was deterioration in the functions of his heart and that he had spells of pain in the chest. He said that on this occasion he had some kind of spell, and he sat down to rest. There were two or three branches to cross and he mistook one that led to the house of one of the witnesses, for the one that led to his own house; after he had gotten into the wrong path in the dark the wandering of the old man is not naturally to be attributed to insanity nor is it evidence of insanity.

The most intelligent witness who expressed a doubt as to the testamentary capacity of the testator showed that the opinion given by him, in so far as it went to sustain the plaintiff's theory, was drawn to a standard of testamentary capacity higher than the law requires. In the first place the objection to the question propounded to the witness should have been sustained. It is not competent for a witness to give an opinion as to whether or not the testator had mental capacity to make a will; that is the question the jury is

to answer. A witness after laying proper foundation may give his opinion as to the condition of the man's mind, then the court will instruct the jury as to the standard of intelligence one must have to enable him to make a will and it is for the jury to say whether or not the evidence shows that the testator measured up to that standard. The law does not require the high degree of intelligence to make a will that is necessary in some other matters. The counsel propounding this question had the correct standard in his own mind and indicated it in the question, but instead of asking the witness if in his opinion the testator had sufficient mental capacity to understand the nature and character of his property, the natural objects of his bounty and to understand the disposition he was making of his estate by the will, he fell into the error of asking him if in his opinion the testator had capacity to make a will.

Doubtless from a banker's standpoint of business capacity this man ought to have known the condition of his account, but it was no evidence of unsound mind that he did not know it. It was only a matter of a hundred dollars which to a man of his means was not a large sum. The deposit had not been made by him; if he had ever heard of it he had forgotten it and that is all that can be made of it.

We come now to the question of senile dementia as indicated by the old man's desire to marry a young woman.

Out of all the plaintiff's testimony on this point there is no suggestion of any impropriety in his conduct or lack of respect to the young women of his acquaintance; there is therefore in his case an absence of that symptom of dementia. And that his thought of marriage was not entirely the output of a diseased mind is also shown in some of the plaintiff's testimony. Even Mr. Canby, who said the old man "was crazy over women," also said that at times he said that "if he could marry some middle aged woman to be good to

him and take care of him in his old days, it would be a great benefit to him.''

One of the expert witnesses said in answer to a hypothetical question that it was a case of senile dementia. In the hypothetical question itself, however, it was expressly assumed that the man was crazy.

Dementia is but another word for crazy, and, therefore, when the expert witness said in effect that if he was required to give a name to the disease under which a man over eighty years of age ''practically crazy on the subject of marriage'' was laboring, he would call it senile dementia, he only substituted a technical name for a common one, but threw no light on the subject. The defendant's objection to the question should have been sustained. On further examination the same witness said that the desire of an old man for women was a symptom of senile dementia, that a tendency of senile dementia was to produce a hardening and contraction of the brain, and that whilst the desire of an old man for women was a symptom of senile dementia, yet that symptom alone would not produce the hardening of the brain. Then the witness said: ''Of course there is a certain class of persons we call 'cranks,' but then a person may be crazy on one subject, but not crazy on another, but then I don't believe a man can be really wholly insane on any subject and then be perfectly sound on other subjects.'' The same learned witness said that if a man over eighty years of age should express a desire to marry to make a home for himself and have a wife to take care of him in his old days it was no symptom of senile dementia. Common sense is not indebted to science for knowledge of that fact.

Even if we leave out of view the evidence introduced on the part of the defendants on this point, and give full weight to all that the plaintiff's testimony tends legitimately to prove, we could only say that the testator showed a symptom of senile dementia, not that

he was a senile maniac, but that he showed a symptom of disease.

But assume that he was afflicted with senile dementia on the subject of women, that did not necessarily render him insane on other subjects. One of the plaintiff's expert witnesses said that a mind diseased on one subject would be classed as a diseased mind, and that is true; it is true also that a man with a broken arm has not a whole body, but we need no expert to tell us that a mind may be impaired in one faculty and practically unimpaired in all others.

The same learned witness was of the opinion that a man demented by desire of women would be liable to be controlled by the influence of a woman. But that testimony does not supply the gap in the plaintiff's evidence on this point: It bore on the question of undue influence, which, having been cut out of the case by instruction and there being no appeal therefrom, is not before us. If, therefore, it should be conceded that the plaintiffs' testimony went all the way to prove that the testator was afflicted with senile dementia on the subject of women, it stopped short of the point of tending to show that he did not possess mental capacity to make a will. A man may be demented on one subject, he may be old and feeble in mind and body, childish, yet if he has mind and memory enough to know what property he has, to know how he wants to will it, who the objects of his bounty are, and the disposition he is making of his estate, he possesses all the capacity the law requires to enable him to make a will. The evidence for the defendants showed that the testator possessed this capacity in a degree at least equal to that that could be expected in a man of his age, and the testimony for the plaintiffs tended only to prove that he showed a symptom of mania for women, he was forgetful of some trivial matters and exhibited those signs of decay that nature usually holds out in the person of

everyone who lingers beyond his allotted three score years and ten.

When as in this case there was no substantial evidence that the testator did not possess mental capacity to make a valid will it is the duty of the court to so declare as a matter of law. [Sehr v. Lindemann, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 570; Wood v. Carpenter, 166 Mo. 465; Crowson v. Crowson, 172 Mo. 691; Southworth v. Southworth, 173 Mo. 59.] The court should have taken this case from the jury.

There are other questions raised in the brief, but in view of what is above said, it is unnecessary to discuss them.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a judgment declaring the paper writing in dispute to be the last will and testament of John Hamon, deceased, and that defendants recover their costs.

All concur.