## MARY ALICE HEINBACH, Appellant, v. JESSE HEINBACH et al.

### Division Two, November 24, 1914.

1. **SUIT TO PROBATE WILL: Action at Law.** An action in the circuit court to probate in solemn form a will which has been rejected by the probate court is but a will contest, and is an action at law, and the appellate court will not interfere with the verdict of the jury on the ground that the preponderance of the evidence was that there was no unsoundness of mind producing testamentary incapacity, where there was substantial evidence that testator was of unsound mind.

2. ————: ————: **Substantial Testimony: Drunkenness.** Where there is testimony that testator was an old man and for many years had been an extreme drunkard; two physicians say he died of alcoholic dementia, one of them that his condition of dementia must have extended back to a period of time before the will was made; certain statements made by testator indicate that they were either the idle vaporings of intoxication or the result of mental hallucinations, and one son is wholly unaccounted for; and, on the other hand, another physician, with opportunity to know, testifies that he was not afflicted with senile or alcoholic dementia, and nine lay witnesses positively testify that he was of sound mind, the question of

his mental capacity to make a will is one for the jury; for the evidence being substantial, its very inconclusiveness requires the submission of that issue of fact to the triers of the fact, and their finding, if the instructions were proper and there was no error in the admission or rejection of evidence, is conclusive on the appellate court.

3. ———: Interest of Witness: Attorney: Contract of Employ-ment. The interest of any witness in the outcome of a suit may always be shown for the purpose of affecting the credibility of his testimony; but where the witness has admitted that he is an attorney in the case, and has been asked to assist in the trial by the attorney who has a contract of employment by some of contestants for a contingent interest in the property if the will is rejected, it is not prejudicial to the sole proponent to reject as evidence such contract, since it in nowise bears on the issue of testator's incapacity and the interest of the witness is sufficiently shown.

4. DEPOSITION: Absent from Record. The court will not hold that it was error to refuse the offer of a deposition in evidence if it has not been copied into the record.

5. ———: Copy. It is not error to refuse to permit a carbon copy of a deposition to be offered in evidence, if it shows unexplained interlineations, and there is no showing that the original has been lost and no inquiry has been made of the proper custodian, and no effort made to supply it in the way provided by statute.

6. ———: Identity of Deponent. If counsel on both sides and the court knew that deponent was too ill to appear at the trial and was the same person whom the carbon copy of the deposition indicates to be the deponent, and there was no objection to offering it in evidence on the ground of failure to identify, the refusal of the trial court to permit the carbon copy to be read in evidence on the sole ground of failure to identify could not be excused on appeal.

7. ———: Whereabouts of Deponent. Where the deposition shows that deponent resides in the county and within ten miles of the place of trial, it is necessary, as a condition precedent to the admission of the deposition in evidence, that the party offering it show some one of the conditions prescribed by Sec. 6411, R. S. 1909.

8. ———: ———: How Shown: By Subpoena. A subpoena properly issued by the clerk and a *non est* return thereon, are not alone a sufficient showing that a resident deponent who resides within the county is without the State or gone to a greater distance within the State than forty miles from the

place of trial, and therefore to authorize the reading of her deposition in evidence.

9. **WILL CONTEST: Definition of Incapacity.** An instruction which omits some of the elements of incapacity, and thereby prescribes less soundness of mind than the law requires, is not an error of which proponent can complain, since the error is one in her favor.

10. ————: **Instructions: Comment on Evidence: Capacity to Make Contract.** An instruction which picks out certain isolated acts of business transacted by testator and ignores others done wholly or partly by him, is an erroneous comment on the evidence. And an instruction that tells the jury that "notwithstanding he was able to transact some business, signing leases, giving checks and receipts, yet unless the jury find from the evidence he possessed a mind and memory sufficiently clear and unimpaired to take into consideration all his property," etc., and ignores other business acts shown by the evidence to have been transacted by him during the time he is said to have been afflicted with senile and alcoholic dementia, such as the purchase of a house, the purchase of a piano on a contract of time-payment by installments, and the execution of divers dramshop bonds, is such an instruction. Nor is it *held* that a specific mention of all these business acts would have cured the unwarranted mentioning of some of them. The effect of the instruction was to tell the jury that all these business acts went for naught in the scale of sanity, unless the jury went further and found that he "possessed a mind and memory sufficiently clear and unimpaired to take into consideration all his property," etc.; and in effect told the jury that though testator may have been mentally capable of making a contract, it did not follow that he was capable of making a will; and in a close case, is reversible error.

11. ————: **Incapacity: Numerous Definitions.** Numerous instructions defining testamentary incapacity should not be given. Different and dissimilar definitions are misleading.

Appeal from Ralls Circuit Court.—*Hon. William T. Ragland,* Judge.

REVERSED AND REMANDED.

*Charles E. Rendlen* and *Frederick W. Neeper* for appellant.

(1) It has uniformly been held by this court that it is its province to examine the record of the evidence

in a will case to see if there is any substantial evidence to support the verdict or authorize the submission of the cause to the jury. Winn v. Grier, 217 Mo. 447; Archambault v. Blanchard, 198 Mo. 425; McFadin v. Catron, 138 Mo. 227; Hamon v. Hamon, 180 Mo. 685; Crossan v. Crossan, 169 Mo. 631. There is no substantial evidence in the record tending in the slightest degree to prove that Samuel Heinbach on Sept. 27, 1909, was not of sound mind and disposing memory. (2) It requires evidence of probative force that at the very time of the execution of the will, testator was not of sound mind and disposing memory. Winn v. Grier, 217 Mo. 450; Von DeVeld v. Judy, 143 Mo. 363. (3) Facts which occurred at the time of execution of the will including its provisions speak for themselves and clearly show testator knew what he was about at the time, what property he owned, what disposition he desired to make of it, all persons who came within range of his bounty. This makes sufficient showing of qualifications of mind to make a will, and refutes contention that Heinbach was insane when he executed it. The face of the will shows competency. Crowson v. Crowson, 172 Mo. 700; Winn v. Grier, 217 Mo. 450; Wood v. Carpenter, 166 Mo. 487; Martin v. Bowdern, 158 Mo. 390. (4) The test of a testator's competency to make a will is, that the testator understood the business about which he was engaged when he had his will prepared and executed, knew the persons who were the natural objects of his bounty, and understood his relations to them, and knew what property he had and the disposition he desired to make of it. This court has always been careful in preventing juries attempting to make wills for men. It has repeatedly set aside their verdicts. Measured by the following cases this will must be sustained: Von DeVeld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; Sehr v. Linderman, 153 Mo. 276; Winn v. Grier, 217 Mo. 420; Jackson v. Hardin, 83 Mo. 175; Riley v. Sherwood, 144 Mo. 355; Riggin v.

Westminster College, 160 Mo. 570; Couch v. Gentry, 113 Mo. 248; Wood v. Carpenter, 166 Mo. 487; Kirschman v. Scott, 166 Mo. 214; Crowson v. Crowson, 172 Mo. 691; Maddox v. Maddox, 114 Mo. 47; Hamon v. Hamon, 180 Mo. 685; Sayre v. Trustees, 192 Mo. 95; Archambault v. Blanchard, 198 Mo. 384; McFadin v. Catron, 120 Mo. 253; Hughes v. Rader, 160 Mo. 579. (5) A man may be capable of making a will and yet be incapable of making a contract or managing his estate. Maddox v. Maddox, 114 Mo. 35; Crowson v. Crowson, 172 Mo. 702. (6) (a) There is no substantial evidence in the record showing incapacity at the time the will was executed. There is conflict of "opinions" but the opinions of unsoundness were predicated on state of facts that do not show incompetency. The "opinions" amount to nothing and give no force to such facts. Winn v. Grier, 217 Mo. 449; Wood v. Carpenter, 166 Mo. 487; Crowson v. Crowson, 172 Mo. 700; Sehr v. Lindemann, 153 Mo. 288. (b) The law requires something more than mere indefinite generalities to destroy or overbalance the presumption of sanity. McFadin v. Catron, 138 Mo. 197; Riggin v. Westminster College, 160 Mo. 570. (7) Testimony by subscribing witness against the validity of a will is looked on with suspicion. His testimony deserves to be discredited. Southworth v. Southworth, 173 Mo. 74; Hughes v. Rader, 183 Mo. 702; Mays v. Mays, 114 Mo. 541. (8) James O. Allison, and through him Jack Briscoe, had a direct pecuniary interest at the time in having the will denied probate, they had an interest in the devolution of the estate and in the probate of the will that determined the devolution of the estate. At common law under this contract as grantee therein he could contest the validity of the will and defeat plaintiff's title. The exclusion of Allison's contract for a six-tenths interest was prejudicial error. Watson v. Anderson, 146 Mo. 333; Sec. 555, R. S. 1909; Teckenbrocke v. McLaugh-

lin, 246 Mo. 719. (9) Instruction 3 given by the court at the request of respondents was erroneous. It in fact told the jury that even though testator was able to transact business of the character and the only kind in which he was engaged yet the jury might find testator incompetent. It commented on the evidence and denied probative force to the facts upon which any opinions worthy of consideration could be predicated; and the only proper criteria which the jury could properly consider in determining whether testator rationally acted. These facts were for the consideration of the jury alone with the other evidence, in determining the issue of fact; and the instruction attempts to prejudge these matters which, if taken out of the case, would leave the mere negative opinions of witnesses, not predicated on substantial facts, to determine their verdict. This instruction was calculated to mislead and unduly influence the jury. Benjamin v. Met. St. Ry., 50 Mo. App. 602; Drug Co. v. McMahan, 50 Mo. App. 18; Railroad v. Stock Yards, 120 Mo. 541; McFadin v. Catron, 120 Mo. 274.

*J. O. Allison, Jack Briscoe, H. Clay Heather* and *Charles T. Hays* for respondents.

(1) The real purpose of appellant's contention that the court erred in excluding evidence of the contract of senior counsel for defendants pertaining to his contingent fee, will not escape the court. Such contentions are sometimes made before a jury, but rarely in an appellate court. The counsel was not asserting any rights of his own and was not a party to the suit. Suffice it to say that the attorney's contract could not have any relevancy to the issue of testator's sanity. (2) Instruction 3 was not an adverse comment. Neither does it tell the jury what weight to give any of the evidence. Coats v. Lynch, 152 Mo. 161; Gordon v. Burris, 153 Mo. 223; Holton v. Cochran,

208 Mo. 418; Goodfellow v. Shannon, 197 Mo. 279. A
similar instruction was before this court and was not
criticised by court or counsel. Archambault v. Blan-
chard, 198 Mo. 422; Holton v. Cochran, 208 Mo. 419;
Tilbe v. Kamp, 154 Mo. 575. (3) (a) It may be con-
ceded that it is the province of this court to examine
the evidence to determine whether there is any sub-
stantial evidence to sustain the verdict, but not to
weigh the evidence. That rule obtains in will contests
as in all other cases at law. Bensberg v. Washington
University, 251 Mo. 641; Wendling v. Bowden, 252 Mo.
647; State ex rel. v. Guinotte, 156 Mo. 520. (b) The
rule is that the burden is upon the proponents of the
will to show that the testator was of sound mind, and
such proof is a requisite of their prima-facie case,
although, it seems, they may be aided by proof intro-
duced by contestants. Bensberg v. Washington Univer-
sity, 251 Mo. 641. (c) The facts showed neither testa-
mentary purpose nor capacity, and, with the inequality
mentioned, must impress the just mind with a convic-
tion against the will. Wendling v. Bowden, 252 Mo.
688; Hardy v. Sullens, 46 Mo. 152; Meier v. Buchter, 197
Mo. 86; Mowry v. Norman, 223 Mo. 463; Bensberg v.
Washington University, 251 Mo. 654. (d) With re-
spect to appellant's point wherein she would discredit
the testimony of the subscribing witnesses, it is to be
noted that they were plaintiff's witnesses. The facts
here are entirely different from those in the cases cited
by appellant, particularly Hughes v. Rader, 183 Mo.
700. (4) This will contest is a law case and the ver-
dict of the jury, being based upon substantial evi-
dence, must stand. The evidence is not only substan-
tial but well nigh conclusive against the will. The tes-
tator was a confirmed drunkard for more than twenty-
five years of the latter end of his life. For several
years during the close of his life he suffered from al-
coholic dementia and finally died of that disease. The
disease was progressive in its nature and effects, the

testator was possessed of hallucinations and delusions. His body was enfeebled and his mind practically gone when he attempted to make the will. He had, several years before, given up attending to his business. He realized and expressed his inability to look after his business affairs. He had become oblivious to obligations of morals and of blood. His alleged will was unreasonable, unequal, unfair and unjust in its provisions. Buford v. Gruber, 223 Mo. 231; Crum v. Crum, 231 Mo. 626; Bensberg v. Washington U., 251 Mo. 647; Knapp v. Trust Co., 199 Mo. 640; Cowan v. Shaver, 197 Mo. 203; Mowry v. Norman, 223 Mo. 463; Meier v. Buchter, 197 Mo. 68; Holton v. Cochran, 208 Mo. 314; Roberts v. Bartlett, 190 Mo. 680; Benoist v. Murrin, 58 Mo. 307; Hardy v. Sullens, 46 Mo. 147.

FARIS, J.—This is a proceeding under the statute to probate, in solemn form, the will of one Samuel Heinbach, deceased. The plaintiff is the widow and (except for merely nominal bequests to decedent's three children) the sole devisee under the alleged will. The defendants Jesse Heinbach, Naomi Summers and Edith Britton are the children and heirs at law of deceased, and William F. True is the administrator of the estate of deceased.

Samuel Heinbach made the alleged will in controversy on September 27, 1909, and died in Ralls county, Missouri, on January 3, 1910. When the paper writing in controversy (hereinafter for brevity we beg the question and call said paper a will, and designate Samuel Heinbach as the testator) was presented to the judge of the Ralls County Probate Court, it was rejected and probate thereof refused. Thereupon the plaintiff brought this action in the circuit court of said county, and being cast therein, appealed to this court.

The petition was in the usual form; no point turns either upon its form or contents; so we need not cumber the record with it.

The answer, after admitting the formal allegations of heirship of defendants, the death of testator, the rejection of the will by the probate court, and the appointment of defendant True as administrator, averred as affirmative defenses, lack of testamentary capacity in testator, arising from an unsound mind, superinduced by old age and the excessive use of intoxicants, and that the said will was the result of undue influence exerted upon testator's mind in its alleged weakened state. But there was no sufficient proof adduced upon the latter point, so the learned judge *nisi* properly took this phase of the case from the jury, and thus it falls out of the case.

In the view which we are forced to take of the case, it will not become necessary to set out in detail the facts shown by the testimony of each of the several witnesses. The record is voluminous, containing as it does, over six hundred pages, and so we shall here content us with a sort of shorthand sketch of the salient facts in the case.

Samuel Heinbach, the testator, was a native of Indiana, where he married in 1872. Nine years later he abandoned his wife and children, of the latter of whom there seems then to have been two living, and came to Pike county, Illinois. Here at a point on the Mississippi River, about opposite the present village of Ilasco, he located himself and began to cut cordwood and do other work in the timber for a livelihood. One period of reconciliation with his first wife and family is shown, but whether this occurred within the nine years prior to 1881 or subsequent thereto and between the latter date and 1885, is dark and obscure in the record. There are both evidence and inferences in the record supporting either view. Likewise, it may be said in passing, there is some vague but hardly credible support for the view that his wife and family deserted him. But neither point is directly in issue or necessary to be ruled on. We but refer to it in fairness.

When the final separation occurred (the date whereof is upon the whole record exceedingly obscure), testator returned to the eastern banks of the Mississippi River, leaving his wife and young family in an indigent and poverty-stricken condition, and again took up his labors as a wood-chopper and a worker in the forests. For many years he lived with one Theodore Johnson and kept "batch," as the witnesses express it in the vernacular. About 1888 testator moved across the Mississippi River to a point in Ralls county some three miles south of Hannibal, Missouri. There he and Johnson had purchased together as tenants in common a tract of land containing some fifty-two acres. Johnson married about 1887 and went to live on this land, and verbal partition (subsequently consummated by mutual conveyances before this cause of action arose) between him and testator of this land seems to have been had, after which testator lived alone on his twenty-six-acre tract, subsisting by the cultivation of his land as a truck-farm and the sale of vegetables and produce therefrom.

In 1901 a large factory for the manufacture of Portland cement was constructed on a tract of 1800 acres of land near, or immediately adjacent to, the said land of testator. Testators' land thereupon came into demand as building sites for the houses of employees at this cement factory, and for sites for shops and stores, so that a small village, called Ilasco, grew up thereon. This land is the bone of contention here, forming as it does practically the whole estate of testator.

When testator and Johnson purchased the land in 1887, they paid only some ten dollars per acre for it, but when this case was tried the value of testator's part of it was laid at from $12,000 to $15,000.

Shortly after the construction of the cement factory testator began to lease building lots (pursuant to a rough plat made by Jack Briscoe, then his agent, now

of counsel for defendants) on the basis, as a rule, of
what the witnesses style ''ground-rent'' of one dollar
per lot per month. There were something over a hun-
dred of these leased lots (to be exact, 106) held by tes-
tator's tenants upon leases running from their sev-
eral dates for ten, fifteen, twenty and twenty-five
years, the ground-rent from which had for several
years been bringing testator an annual gross income of
from $1065 to $1120.

From about the middle of September, 1905, down
to the date of testator's death, he had an agent (at
first, and from September or October, 1905, to October,
1906, said Briscoe, and thereafter till his death, one
H. F. Fleurdelis), who collected his rents and for the
most part prepared his leases and receipts, or, to be
more exact, filled in the blanks therein, as both the
receipts and the leases (for the major part) were upon
printed blanks. But seven out of some fifty-six leases
are shown by the proof as having been made prior to
October, 1905, and presumably therefore by testator
himself. In 1906 the latter procured by default a di-
vorce from his first wife on the ground of desertion.
This wife had then ten years before remarried, appar-
ently without the prior formality of procuring a di-
vorce from testator.

Testator, as far back as the witnesses are able to
recall, was intemperate, and this condition grew on
him with the years and after dramshops became plen-
tiful and liquor more convenient at Ilasco. Touching
the fact of his excessive use of strong drink the wit-
nesses are practically unanimous, differing for the
most part only in the degree of sottishness which they
attribute to him. Some of them say that in thirty
years' acquaintance with him they never saw him
wholly from under the influence of intoxicants; still
others say that he was the worst drunkard they had
ever known; others yet, on the contrary, say they have
sometimes seen him sober, once for a period of two

weeks, continuously. Two physicians, one of them his family physician, say that he died of alcoholic dementia. One of these, testifying largely from the history of his case and partially hypothetically, says that this condition of dementia must have existed for as much as a year before his death, and it therefore included the time at which the will was made. *Per contra,* another physician, who had formerly likewise long been his physician, and with opportunities equal to any other witness in the case to know and observe his condition, swears that he was not a senile or alcoholic dement, but was of sound mind.

Nine lay witnesses swear positively that testator was sane; while five for the defendants are equally positive that he was not of sound mind. Some, at least of the latter, had reasons fairly well founded for the opinions they expressed.

Plaintiff prior to her marriage to testator was a widow of mature age; the relict of one Scott, sometime recorder of Pike county. Her marriage to testator was but a little over nine months old when the will was made and but a year had elapsed when testator departed this life.

The charge of undue influence properly fell out of the case for lack of proof to sustain it and we need not follow it further. Plaintiff, it may be said in passing, was, so far as the record before us shows, uniformly kind and attentive to testator, omitting for his care and comfort no wifely duty, though his filthy drunken condition often rendered the performance of these duties peculiarly onerous and revolting. Testator, as the proofs shows, fully appreciated plaintiff's care and attention, and spoke of her uniformly with much love and kindness.

Testator talked loosely, possibly drunkenly, of the condition and financial states of his children. Many things he said of them as to their station in life and their comfortable situations were apparently false;

but whether these statements were but the drunken, idle vaporings of intoxication, or whether they were the results of mental hallucinations, is utterly dark from the record. His son Jesse is wholly unaccounted for and whether, except for the purposes of this particular action, he be living or dead, we cannot ascertain from this record, though the showing is made that he had been absent, unheard of, for nineteen years when the case was tried. It is of sentimental value only and in nowise pertinent to or decisive of the legal questions herein involved that testator's children, the defendants here, made no greater effort to find him (till he was dead) and aid and comfort him than he, on his part, made to find and assist them. Any, the least, effort on either side would indubitably have resulted in discovering the whereabouts of the other side.

Upon the trial of the case the court gave, among other instructions asked by defendants, this one, to-wit:

"Notwithstanding the jury may believe from the evidence that Samuel Heinbach was able to transact some business, signing leases, giving checks, receipts, yet unless the jury believe and find from the evidence that at the time of the execution of said alleged will, said Samuel Heinbach possessed a mind and memory sufficiently clear and unimpaired to take into consideration all his property, and the persons who had a natural and reasonable claim on his bounty, if any, and the disposition he desired to make of his property, then he did not have sufficient capacity to make a will and the verdict of the jury must be against said will."

The jury by their verdict found that the paper writing in controversy was not the last will of decedent and plaintiff has appealed in due form.

Other facts, if such shall become necessary, will be found set forth in the opinion.

I. Counsel for plaintiff in the assignment of errors in their brief set out thirteen different reasons why the judgment below should be reversed. Coming to a critical examination of them we conclude that in all fairness and clarity these alleged errors may all be considered under four heads; more especially so since, for what seems to us fatal error, we are forced to reverse and remand the case. So, we shall discuss these assignments under four heads, which include all points briefed.

The first contention made is, that there is no sufficient evidence of unsoundness of mind producing testamentary incapacity to take the case to the jury. We will consider briefly whether this is so.

**Incapacity of Testator: Sufficient Evidence.** The rule is now well and abundantly settled that a will contest (and this action though technically an action under our statute to probate a rejected will in solemn form, is yet in the last analysis but a will contest) is an action at law and the rule that as an appellate court we may not interfere where there is substantial evidence to sustain the verdict of the triers of fact, prevails and concludes us. [Roberts v. Bartlett, 190 Mo. l. c. 695; McFadin v. Catron, 138 Mo. l. c. 227; Naylor v. McRuer, 248 Mo. l. c. 458; Hill v. Boyd, 199 Mo. l. c. 448; Turner v. Anderson, 236 Mo. 523; Knapp v. Trust Co., 199 Mo. l. c. 663.]

In the case of Naylor v. McRuer, supra, Division Two of this court, quoting largely from Roberts v. Bartlett, supra, said:

"As a court of errors in a case of law, as a contest of a will case under our statute is, we are not required to pass upon the credibility of the witnesses and the weight of the evidence, if the evidence be substantial; these considerations are relegated to the triers of fact.

"This doctrine is said in Roberts v. Bartlett, 190 Mo. l. c. 695, to be well settled in this State. In this behalf the language of GANTT, J., in the case above

cited, is pertinent: 'The rule of practice is well set-
tled in this State, that a will contest is an action at
law, and this court will not reverse the judgment be-
cause the jury found against the weight of the evidence,
but that this court will examine the record to see if
there is any testimony to support the finding, and where
there is no evidence whereon to base the verdict, the
judgment will be reversed. [State ex rel. v. Guinotte,
156 Mo. l. c. 520, 521; McFadin v. Catron, 138 Mo.
227.]' "

When we have recourse to this rule in the instant
case we see that there was adduced substantial evidence
of testator's testamentary incapacity. We have in the
statement of the case briefly referred to the number
of witnesses who testified for and against his sanity,
and also briefly to the general trend of their testimony.
The learned court *nisi* was right in taking from the
jury the issue of undue influence, and he was also right
in refusing to take from the jury the question of testa-
mentary capacity. Since the case, however, must be
reversed and remanded for other reasons below set out,
we will not here cumber the books or hamper a retrial
with a resume of the evidence. Suffice it to say, that
while the testimony in our view was by no means con-
clusive or satisfying on the question of the soundness
or unsoundness of testator's mind, it yet being sub-
stantial, and partially by reason of this very incon-
clusiveness, made out a case to be resolved upon proper
instructions by the triers of fact alone. We disallow
this point then, and say that if upon another trial the
testimony as to lack of mental capacity to make a will
shall prove as strong as that in the record before us,
the case should be left to the jury upon this question.

II.  Counsel for plaintiff made most strenuous ef-
forts to put in evidence the written contracts of em-
ployment made between defendants Edith Britton and

Naomi Summers of the one part and one
of defendants' counsel upon the other.
The court below refused to allow these
contracts of retainer to go to the jury,
upon the theory, it may be, that however
much light these instruments might or might not throw
upon the defendants' state of mind, they were of no
probative weight in determining whether testator was
sane or insane at the time he made the will in contro-
versy.

*Interest of Witness: Attorney's Contract of Employment.*

It is urged by plaintiff's learned counsel that these
contracts ought to have been admitted in evidence for
the reason that Mr. Jack Briscoe, one of the attorneys
for defendants, was a witness in the case, and since his
testimony shows that his services were procured by
Mr. J. O. Allison, also of counsel, and the one with
whom the contracts were made, the contents of these
contracts would thus show the interest of the witness
Briscoe in the result of the action.

The record shows that Mr. Briscoe had no contract
based upon the contingency of recovery. In fact, he
denied having any contract with anyone, but testified
he was assisting as counsel because Mr. J. O. Allison
told him he wanted him (Briscoe) to assist in the mat-
ter. Previous to the answer of Briscoe last above, he
had answered, when inquiry was made as to whether he
had any interest in the controversy, that he was "an
attorney in the case." It is too plain for discussion
that the contents of the contracts offered could throw
no light upon the issue before the court. This issue
was *devisavit vel non* and it turned wholly upon the
mental condition of testator on the 27th day of Septem-
ber, 1909. The contracts were not made till January,
1910. Likewise in the light of the facts as shown by
the testimony of Mr. Briscoe, since (he says and it is
not denied) he had no contingent contract with either
the defendants or Mr. Allison, but was merely in the
case because Mr. Allison had asked him to assist in the

matter (inferably, upon an implied agreement that Allison should requite him upon *quantum meruit*), how could the contents of the contracts of defendants with Mr. Allison, whether the same were fair or unconscionable, affect the testimony of Briscoe? He had already said in effect that he was an interested witness, because he had admitted he was an attorney in the case. Without his admitting interest the jury would have known he was an interested witness from the observed fact that he was of counsel. Conceding that as a general rule the interest of any given witness in the outcome of a case, or the bias or prejudice of such witness for or against either party litigant, may always be shown for the purpose of affecting the credibility of such witness (3 Chamberlayne on Ev., sec. 1785; State v. Miles, 199 Mo. l. c. 546), it is yet fairly clear that under the facts here the rejected evidence was at most cumulative upon the point of the interest in the case of Briscoe who, electing to become a witness as well as counsel, admitted an interest in the result of the case, which interest the jury would have noticed without his admission. The contents of these contracts had no other relevancy to this case outside of the exceedingly dim light they cast in a far-fetched way upon Briscoe's admitted interest herein. Since this interest was frankly admitted and since, even if it had been denied, the jury doubtless would have observed it, and known of it, and weighed it, nevertheless, and since it is not only good business but good human nature for a lawyer to feel an interest in the result of the cases in which he or she is counsel, we are not disposed to say that the court erred in refusing to permit these contracts to be offered in evidence. So far as we are able to see the only effect of the contents of these contracts upon the jury would have been to bias their judgment by prejudicial means. In passing, and looking by and large to the whole record in this case, we are constrained to say that had half as much effort been made

upon the trial to frankly develop the actual facts as was made to inject hurtful prejudice into the minds of the jury, we might possibly have been able to ascertain from the record the real condition of the testator's mind and so might, perhaps, have been able to obviate a reversal of the case. As the record is we cannot conclude either way, and must needs reverse for error.

III. It is contended by plaintiff that the court should have permitted plaintiff to offer the copy of the deposition of one Mrs. Mary Smashey, since the record discloses that the witness Neil Smashey testified that his wife Mary was ill, under the care of a physician and unable to appear personally and **Depositions.** testify. When learned counsel for plaintiff offered to read an alleged carbon copy of Mrs. Smashey's deposition he did not identify her as being the Mary Smashey who, the proof showed, was too ill to appear. But as this from the whole record clearly was known both to counsel on both sides and to the court and as no objection to the offering was made for failure to show identity, we would not be able to excuse the trial court's action on this ground alone. But since counsel have not seen fit to copy the refused deposition into the record, we are unable to say whether the refusal to admit it was error or not. We are not permitted to assume the existence of reversible error from the mere allegation of its existence; the law is that he who alleges error must prove error. Besides (and on this ground the action of the court *nisi* was entirely right), the record shows that counsel for plaintiff merely made profert of an alleged carbon copy of Mrs. Smashey's deposition, saying, in so offering such copy, that he was unable to find the original. Counsel for defendants objected to the offering of the copy of this deposition. Plaintiff's counsel expressed himself as being unable to state whether certain interlineations which he stated he found upon the carbon copy

had been made thereon by the witness, or made before the witness Mrs. Smashey signed this copy.    Since there is no showing that the original deposition was lost, no inquiry having been made of the proper custodian thereof, and since no effort was made to supply this document as provided by statute (pretermitting the weightier and sufficient objection that this deposition is absent from the record), we hold that the court below was right in refusing to allow the alleged copy of the deposition to be offered.

Likewise, plaintiff contends that the court erred in refusing to admit in evidence the deposition of Mrs. Ola Gregory.    In this the court was also right.    No showing was made as to the whereabouts of Mrs. Gregory at the time her deposition was offered.    Her deposition shows that she resided at Ilasco, which place the record abundantly shows is in Ralls county and only some ten miles or less distant from New London where the trial occurred.    This being so, it was incumbent on plaintiff, as a condition precedent to the admission of this deposition, to first show some one of the conditions under which section 6411, Revised Statutes 1909, permits a deposition to be offered.    This plaintiff did not do.

Some controversy arose as to an alleged *non est* return upon a subpoena for this witness.    But neither such subpoena nor the sheriff's return thereon was offered.    While under the statute we scarcely see the pertinency of this controversy, since it turned upon the question of whether a *non est* return (which was not offered) upon a subpoena (likewise not offered), the body of which may or may not have been written by counsel, but which was signed and sealed by the clerk (or his deputy), is a sufficient showing under section 6411, supra, to admit a deposition to be read without further proof of the absence of a resident witness from the State.    We fail to see how it would be, or how the return on any subpoena, however written

or issued, would of itself alone be a sufficient showing under our statute. Here it was incumbent upon plaintiff as a condition precedent to the offering of the deposition of this resident witness, to show either that the witness was without the State, or, being within the State, that she had gone to a greater distance than forty miles from the place of trial, without the consent, connivance or collusion of plaintiff.

IV. The serious question in the case is the contention that instruction numbered three is erroneous. This instruction we set out *verbatim* in the statement of the case.

Appellant contends that said instruction three is a comment on the evidence and that it presents an erroneous definition of testamentary capacity. Taking the last objection first, and pretermitting

Instruction on Incapacity. for the moment the question of the alleged comment on the evidence, if any, in this instruction, as well as the question of how far such comment serves to render bad the attempted definition, we conclude that even if the definition of the sufficiency of the soundness of mind which is meet for will-making, falls short of that given in the books, yet plaintiff was not hurt by it. The lack of sufficiency of definition was here in her favor. Testator, even if we concede all that plaintiff says of it, was by this instruction allowed to make a will though his mind lacked some of the elements of soundness—some of the tests prescribed in the adjudged cases. [Turner v. Anderson, 236 Mo. l. c. 544; Crum v. Crum, 231 Mo. l. c. 638; Holton v. Cochran, 208 Mo. 314; Roberts v. Bartlett, 190 Mo. l. c. 699; Naylor v. McRuer, 248 Mo. l. c. 462.] So, if the test of mental capacity as prescribed by this instruction fell so far short of being correct as to be erroneous, the error was clearly one in plaintiff's favor and she is in no position to complain. [Naylor v. McRuer, 248 Mo. l. c. 463.] She was upholding the will.

If the instruction permitted testator to make a valid will while possessing less soundness of mind than the law allowed, plaintiff was not hurt and so she may not complain. This is what we said in the case of Naylor v. McRuer, supra, while there approving the definition of mental capacity commensurate with testamentary capacity at set out in Turner v. Anderson, 236 Mo. l. c. 544. So much for the criticism of the definition of testamentary capacity as found in said instruction three.

But the point that this instruction is a comment upon the evidence, we think is well taken. Besides, two other criticisms may well be lodged against it. It picks out but three isolated items of business shown by the proof to have been transacted by testator and ignores other contracts made largely or wholly by him, to-wit, the purchase of a house and lot from Dr. Tutt, and the purchase of a piano on a contract of time-payment by installments, as also other business papers executed, to-wit, divers dramshop bonds. All these things are shown by the proof to have been done by testator within the period during which Dr. Detweiler says he was a senile dement. We are not holding that such specific mention of all of the business acts of testator would have cured this instruction. We may be permitted to doubt this. This fact does, however, lend much color to the charge that the instruction comments upon the evidence.

Its effect is to utterly destroy with the jury whatever probative force exists in favor of sanity, and arising from the proven facts that testator did the several acts and items of business which we mention and also those which the instruction recites. Plaintiff was entitled to the full benefit of this proof. But this instruction says to the jury that even though testator was able to transact the business mentioned, all these acts went for naught in the scale of sanity, unless the jury went further and found that he "possessed a mind and memory sufficiently clear and unimpaired to take into con-

sideration all his property, and the persons who had a natural and reasonable claim on his bounty, if any, and the disposition he desired to make of his property." Both the letter and the spirit of this instruction are opposed to the well-settled rule of law in this State that a man may be mentally capable of making a will when he is mentally incapable to make a contract. [Brinkman v. Rueggesick, 71 Mo. 553; Crossan v. Crossan, 169 Mo. 640; Giboney v. Foster, 230 Mo. l. c. 134; Knapp v. Trust Co., 199 Mo. l. c. 663; Roberts v. Bartlett, 190 Mo. l. c. 696; Hamon v. Hamon, 180 Mo. 685; Crowson v. Crowson, 172 Mo. l. c. 702.] This instruction tells the jury in effect that though the testator might have been mentally capable of making a contract it did not follow that he was mentally capable of making a will  It may not have followed in truth, either as a medical or a legal corollary, but plaintiff in so doubtful and dark a case as this was entitled to have the jury consider all of the acts of business testator did in connection with all other facts and circumstances of the case in order to throw light upon the questions of whether when he made his will be understood he was doing so; whether he understood the nature and extent of his property; whether he knew all persons who reasonably came within his bounty and who were the natural objects thereof; whether he understood to whom he desired to give his property and to whom he was giving it and whether he was able without the aid of others to retain these facts in mind long enough to make his will.

We feel no manner of doubt as to the error in this instruction and need not pursue this inquiry further. The case of Archambault v. Blanchard, 198 Mo. l. c. 422, where, we are told an almost identical instruction was given, is called to our attention. We find that such an instruction practically identical with this one was given in the above case and that neither counsel nor this court criticised it. But even a casual reading

of that case shows that this instruction (numbered 8, and appearing on page 422 of the reported case) was never approved either expressly or impliedly; for after the instructions were set out in the statement of the case, none of them was ever afterwards mentioned in the opinion, and the case was reversed and remanded with directions to probate the will, because there was not sufficient evidence to take the case to the jury. It therefore never became necessary to mention this instruction. But it is peculiarly unfortunate that this instruction should have been set out in the statement of the Archambault case, as the doing so may well have misled, as it undoubtedly did here mislead, both counsel for defendants and the learned trial court in this case.

Since for this error this case must be retried, we may here say that instruction two for defendants seems. a correct and fair statement of the law. [Turner v. Anderson, 236 Mo. l. c. 544; Naylor v. McRuer, 248 Mo. l. c. 462; Crum v. Crum, 231 Mo. l. c. 638; Holton v. Cochran, 208 Mo. l. c. 410; Goodfellow v. Shannon, 197 Mo. l. c. 280; Knapp v. Trust Co., 199 Mo. l. c. 663; Hamon v. Hamon, 180 Mo. l. c. 701; Current v. Current, 244 Mo. l. c. 437; Farmer v. Farmer, 129 Mo. l. c. 538.] We see no reason for defendants asking three instructions, however, each defining testamentary capacity. in different terms. If it should become necessary, and counsel are so advised, to refer more than once to the definition of testamentary capacity, it would simplify matters to refer aptly to the definition already given. However, if such reference does not suffice, at least three dissimilar, and therefore, to an extent misleading definitions, should not be given. One should be selected and adhered to.

For the reasons set out the case should be reversed and remanded, to be retried in accordance with these views. Let this be done.

*Walker, P. J.,* and *Brown, J.,* concur.